UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VELSICOL CHEMICAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| AMERICAN INTERNATIONAL | ) | |
| SPECIALTY LINES INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

FILED: MAY 15, 2008
08CV2822          TD
JUDGE SHADUR
MAGISTRATE JUDGE VALDEZ

## **COMPLAINT**

Plaintiff, VELSICOL CHEMICAL CORPORATION ("Velsicol"), by its counsel, David B. Goodman, S. Jarret Raab, and Rebecca Hanson, Shaw, Gussis, Fishman Glantz, Wolfson & Towbin LLC, *of counsel*, complains against Defendant, American International Specialty Lines Insurance Company ("AISLIC") as follows:

### **Nature of the Action**

1.      Velsicol has brought this action to obtain a determination of its rights under the pollution legal liability insurance policy issued to it by AISLIC as policy number PLS/CCC 476 16 184 (the "Policy"), effective from December 22, 1999 through December 22, 2009, and to enforce Velsicol's contractual rights under the Policy.  A copy of the Policy is attached as **Exhibit 1**.

2.      On April 11, 2007, the City of St. Louis, Michigan filed a lawsuit against Velsicol, NWI, Inc. (f/k/a Fruit of the Loom, Inc.), LePetomane II, Inc., as Trustee of the Fruit of the Loom Successor Liquidation Trust, LePetomane III, Inc., as Trustee of the Fruit of the Loom Custodial Trust (LePetomane II, Inc. and LePetomane III, Inc. are hereinafter referred to

collectively as the "Trust"), and against Edgewood Farms, Inc., in the 29th Judicial Circuit for the County of Gratiot, Michigan, as Case No. 07-10385 CE (the "Underlying Action"). A copy of the most current complaint from the Underlying Action (the "Underlying Complaint") is attached as **Exhibit 2**. The Underlying Action was removed to the United States District Court for the Eastern District of Michigan, Northern Division, where it is currently pending as Case No. 1:07-cv-13683.

3.     In May 2007, Velsicol timely tendered notice of the Underlying Action to AISLIC pursuant to the Policy and demanded that AISLIC defend and indemnify it against the claims asserted in the Underlying Action. However, AISLIC failed to respond to Velsicol's tender, or to Velsicol's subsequent communications to AISLIC concerning the Underlying Action, in a timely manner.

4.     On February 5, 2008, AISLIC, for the first time, acknowledged receipt of Velsicol's claim pertaining to the Underlying Action. Initially, by correspondence dated February 5, 2008, a copy of which is attached as **Exhibit 3**, AISLIC "accepted" defense of the Underlying Action without identifying the coverage or coverages pursuant to which it accepted the defense of the Underlying Action. Further, AISLIC's February 5 letter failed to reserve its rights pertaining to the claims in the Underlying Action.

5.     Subsequent to February 5, 2008, AISLIC acknowledged that the deductible applicable to the Underlying Action has been met. However, in derogation of its obligations to Velsicol arising under the Policy, AISLIC has improperly attempted to evade its duty to pay for Velsicol's cost of defense in the Underlying Action and has improperly purported to reserve its rights under the Policy. Among other things, AISLIC now purports to assert policy defenses that it had previously waived both through its failure to respond to Velsicol's tender and to a

settlement demand tendered in the Underlying Action in a timely fashion and that AISLIC waived through its February 5, 2008 correspondence.  Further, since February 5, 2008, AISLIC has failed to meet its obligations to Velsicol under the Policy and has compromised Velsicol's defense in the Underlying Action.  Through this lawsuit, Velsicol seeks a declaration of its rights under the Policy, to recoup the damages it has incurred as a result of AISLIC's breach of its duties under the Policy and that it has incurred as a result of AISLIC's bad faith.

## The Parties

6.      Plaintiff, Velsicol is a Delaware corporation having its principal place of business in Rosemont, Illinois.

7.      Defendant, AISLIC, is an Alaska corporation with its principal place of business in New York, New York.  AISLIC is an insurance company licensed to transact business in the State of Illinois.

8.      The amount in controversy in the disputes between Velsicol and AISLIC relating to the Underlying Action exceeds $75,000.00.  The defense costs at issue in the Underlying Action exceed $75,000.00, and AISLIC has rejected a policy limits demand exceeding the jurisdictional minimum in the Underlying Action.  Further, AISLIC has denied insurance coverage under the Policy on claims against Velsicol far in excess of $75,000.00.

9.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C.§§1332(a) and (c) as it involves disputes between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

10.     Venue is proper in this district as the dispute arises from an insurance policy negotiated and issued in this district to a corporation with its principal place of business in this district.

**The Policy**

11.    Effective December 22, 1999, AISLIC issued the Policy to Velsicol.  Among other things, the Policy provides coverage for third-party claims for damages resulting from pollution conditions including third-party claims for bodily injury, property damage, and clean-up costs arising from pollution conditions that originated at certain insured properties identified in the Policy.

12.    The Underlying Complaint alleges that at all times material to the Underlying Action, Velsicol owned and operated a plant in St. Louis, Michigan (the St. Louis Plant").  The Underlying Complaint alleges that Velsicol manufactured, stored, and handled DDT and DDT-related products and wastes including p-CBSA at the St. Louis Plant.

13.    The St. Louis Plant is an "Insured Property" as that phrase is defined in the Policy.

14.    In "Coverage D" of the Policy, AISLIC agreed as follows:

> "To pay Loss on behalf of the Insured that the Insured becomes legally obligated to pay as a result of Claims first made against the Insured and reported to the Company in writing during the Policy Period, or during the Extended Reporting period if applicable, for Clean-Up Costs beyond the boundaries of the Insured Property resulting from Pollution Conditions which commenced prior to the Continuity Date.

15.    In "Coverage F" of the Policy, AISLIC agreed as follows:

> "To pay Loss on behalf of the Insured that the Insured becomes legally obligated to pay as a result of Claims first made against the Insured and reported to the Company in writing during the Policy Period, or during the Extended Reporting period if applicable, for Bodily Injury or Property Damage beyond the boundaries of the Insured Property that result from Pollution Conditions on or under the Insured Property which have migrated beyond the boundaries of the Insured Property."

16.    "Property Damage" is defined in the Policy to include the following: "(1) Physical injury to or destruction of tangible property of the parties other than the Insured, including the

4

loss of use or value thereof; and (2) Loss of use, but not loss of value, of tangible property of parties other than the Insured, which has not been physically injured or destroyed."

17.    The Policy provides that AISLIC has a duty to defend claims falling within Coverages D and F.  The Policy provides that AISLIC must pay all reasonable defense costs up to the limit of liability once the applicable deductible amount has been met on claims falling within Coverages D and F.

18.    The "Each Incident" deductible applicable to claims falling with Coverage D is $500,000.00.  The "Each Incident" deductible applicable to claims falling with Coverage F is $500,000.00.

19.    Pursuant to the Policy, in the event the same, related, or continuous "Pollution Conditions" result in coverage under more than one coverage section in Coverages A through J of the Policy, only the highest deductible amount among the coverages applicable to the claim is applied to the claim.

## The Claims In The Underlying Action

20.    The Underlying Complaint asserts that plaintiff sustained damages beyond the boundaries of the St. Louis Plant as a result of groundwater contamination from chemicals that allegedly originated at the St. Louis Plant and migrated beyond the boundaries of the St. Louis Plant.

21.    The Underlying Complaint alleges that the groundwater contamination of which plaintiff complains resulted from the discharge and release of chemicals from the St. Louis Plant that has resulted in contamination beyond the boundaries of the St. Louis Plant as a result of the migration of the chemicals beyond the boundaries of the St. Louis Plant.

22.     All of the claims asserted in the Underlying Action, as pleaded in the Underlying Complaint, allegedly arose out of the same, related, or continuous "Pollution Conditions" as that phrase is defined in the Policy.

23.     In Count I of the Underlying Complaint, plaintiff seeks to recover the cost of remediating certain environmental conditions including the cost of replacement wells, monitoring, investigation, and other actions to remove p-CBSA and other chemicals from plaintiff's drinking water supplies from Velsicol and the Trust.

24.     Consequently, the claim asserted in Count I in which plaintiff seeks to require Velsicol and the Trust to clean-up the contamination falls within the ambit of Coverage D which addresses claims for Clean-Up Costs beyond the boundaries of an Insured Property resulting from Pollution Conditions which commenced prior to the Continuity Date of the Policy.

25.     In Counts II, III, and IV of the Underlying Complaint, plaintiff seeks to recover the property damages it has allegedly incurred and will incur in the future as a result of the alleged contamination of its water supply by Velsicol and the Trust that plaintiff asserts was caused by chemicals that allegedly migrated beyond the boundaries of the St. Louis Plant.

26.     Coverage F provides coverage for property damage beyond the boundaries of the Insured Property that result from Pollution Conditions on or under the Insured Property which have migrated beyond the boundaries of the Insured Property.  Consequently, the claims asserted in Counts II, III, and IV of the Underlying Complaint in which plaintiff seeks to recover its Property Damages from Velsicol and the Trust fall within the ambit of Coverage F.

### AISLIC'S Untimely And Improper Response To Velsicol's Tender

27.     Velsicol provided notice of the Underlying Action in a timely manner in conformity with the terms of the Policy on May 21, 2007.

28.    Months passed without any response from AISLIC to the tender of the Underlying Action. Not having received any response from AISLIC, and as required to protect its interests in the Underlying Action, Velsicol retained Winston & Strawn to defend it in the Underlying Action.

29.    Upon being retained, Winston & Strawn undertook the actions required to defend Velsicol against the claims asserted in the Underlying Action and continues to defend Velsicol in the Underlying Action.

30.    On July 30, 2007 and again in September 2007, Velsicol wrote to AISLIC concerning the claims asserted against it in the Underlying Action. Again, AISLIC failed to respond at all to Velsicol's communications concerning its claim arising from the Underlying Action.

31.    On October 17, 2007, plaintiff in the Underlying Action tendered a policy limit demand ($50,000,000.00) to Velsicol. Velsicol promptly forwarded the policy limits demand it received from plaintiff to AISLIC and requested its insurer to act upon the demand. However, AISLIC failed to respond to the demand, and failed to even acknowledge receipt of the tender.

32.    On December 20, 2007, with the $500,000.00 deductible applicable to Velsicol's claim arising from the Underlying Action nearly met, Velsicol wrote to AISLIC again concerning the claim arising from the Underlying Action. However, AISLIC did not respond to this correspondence or even acknowledge receipt of the tender of the claim.

33.    On February 5, 2008, AISLIC notified Velsicol that it accepted defense of the Underlying Action without reserving its rights in any way and without identifying any exclusions to coverage. The February 5 letter did not advise that AISLIC would provide defense pursuant to Coverage D or that AISLIC had denied Coverage under Coverage F.

34.     In AISLIC'S February 5, 2008 letter, AISLIC advised that it had already been in communication with plaintiff's counsel and counsel for the Trust, without providing notice to Velsicol's defense counsel, in an attempt to settle the dispute.

35.     Notably, the settlement proposal that AISLIC was pursuing in its communications with Plaintiff's counsel and on behalf of the Trust, also an AISLIC insured under a different policy of insurance, would have left Velsicol open to claims arising from the same Pollution Conditions in the future and would have required Velsicol to fund the investigation laying the groundwork for those future claims while at the same time causing the Trust to be released from all such claims.

36.     After February 5, 2008, AISLIC advised Velsicol that AISLIC would not pay the full cost of Velsicol's defense in the Underlying Action.  Instead, AISLIC purported to cap its contribution to the defense costs at rates well below those charged by Velsicol's defense counsel and "offered" Velsicol" an opportunity to either make up the difference in those defense costs or AISLIC would unilaterally impose new defense counsel on Velsicol and declined to even provide any information to Velsicol about this substitute counsel.

37.     In light of the ambiguity and the untimely nature of AISLIC's "acceptance" of Velsicol's defense, and in light of the risks posed by the settlement proposal tendered by plaintiff, Velsicol sought clarification on AISLIC's coverage position.  Specifically, Velsicol asked AISLIC to identify the coverages pursuant to which it had accepted Velsicol's defense, confirmation that AISLIC would not assert any policy defenses to coverage, the limits of coverage currently available to Velsicol under the Policy in connection with the Underlying Action, and information concerning the substitute counsel AISLIC threatened to impose on Velsicol.

38.    Initially, AISLIC declined to provide the information that Velsicol requested. Further, AISLIC demanded that Velsicol take certain actions that would have prejudiced Velsicol in the defense of the Underlying Action.

39.    Finally, on May 6, 2008, nearly one year after Velsicol first tendered the claim arising from the Underlying Action, AISLIC responded by acknowledging that there was indeed a conflict between AISLIC and Velsicol that entitled Velsicol to retain its own counsel.  AISLIC accepted coverage under Coverage D but denied coverage under Coverage F.  Yet, AISLIC improperly purported to limit the defense costs that it would pay on behalf of Velsicol in the defense of the Underlying Action and purported to exert control over Velsicol's defense in the Underlying Action notwithstanding the conflict it had acknowledged.

## COUNT I
## DECLARATORY JUDGMENT

40.    Velsicol reasserts the allegations of paragraphs 1 through 39 of its complaint as the allegations of paragraph 40 of Count I.

41.    AISLIC's delay in responding to Velsicol's tender of the defense of the Underlying Action and its failure to respond to Velsicol's tender of the policy limits demand have prejudiced Velsicol by leaving it exposed to claims in excess of the limits of coverage available under Coverages D and F including claims for exemplary damages.

42.    AISLIC's responses to Velsicol's tender of the Underlying Claim prior May 6, 2008 waived all policy defenses including all exclusions from coverage under the Policy.

43.    Nonetheless, on May 6, AISLIC purported to raise Exclusions A, E, and F as possible limits or bars to Velsicol's coverage under the Policy.

44.     Exclusion A in the Policy excludes coverage for, among other things, Claims and Loss due to any punitive or exemplary damages except where such damages, fines, penalties, or assessments are insurable by applicable law.

45.     Exclusion E in the Policy excludes coverage for, among other things, Claims and Loss resulting from Pollution Conditions that result from a willful act or omission or a willful illegal act or omission.

46.     Exclusion F in the Policy excludes coverage for, among other things, Claims and Loss arising from Pollution Conditions based upon or attributable to any Responsible Insured's intentional, willful, or deliberate noncompliance with any statute, ordinance or instruction of any governmental agency or body if he or she knew or could have reasonably expected that the Claim or Loss would result.

47.     Moreover, even though it acknowledged the conflict between AISLIC and its insured, AISLIC improperly purported to retain the right to control Velsicol's defense in the Underlying Action including the right to limit the actions that could be undertaken in the defense of its insured, Velsicol, in the Underlying Action and sought prior approval of all actions undertaken in that defense.

48.     Further, while acknowledging the validity of Velsicol's concerns about the prejudice it would incur if Velsicol undertook the actions required of it by AISLIC relating to the control of the defense of the Underlying Action, AISLIC insisted that Velsicol undertake those actions or risk forfeiture of its rights under the Policy including the payment of the costs of defending the Underlying Action.

49.    Further, as of the filing of this lawsuit, AISLIC has failed to reimburse Velsicol for the defense costs expended by Velsicol in excess of the deductible notwithstanding the fact that Velsicol has sought reimbursement of those defense costs.

50.    None of the exclusions raised by AISLIC are applicable in light of AISLIC's actions waiving its right to raise policy defenses. AISLIC's bad faith in its failure to timely respond to the tender of the Underlying Action and its bad faith failure to respond to plaintiff's policy limits demand have prejudiced Velsicol and constitute waiver by AISLIC of its policy defenses. AISLIC's "acceptance" of the defense, in the manner communicated by it, waived its policy defenses. Moreover, the exclusions untimely and improperly advanced by AISLIC are not even applicable in the context of the Underlying Action.

51.    Further, as a consequence of AISLIC's failure to timely respond to the policy limits demand tendered by the plaintiff in the Underlying Action, AISLIC is obligated to defend and indemnify Velsicol for any and all claims asserted in the Underlying Action and to indemnify Velsicol for any settlement or judgment in the Underlying Action.

52.    AISLIC's actions subsequent to Velsicol's tender of the defense of the Underlying Action and of plaintiff's policy limits demand were unreasonable and have resulted in substantial prejudice to Velsicol.

WHEREFORE, Plaintiff, Velsicol Chemical Corporation, requests that the Court enter judgment in its favor and against Defendant, American International Specialty Lines Insurance Company as follows:

1.    Declaring that Velsicol is entitled to a defense by AISLIC for claims asserted in the Underlying Action pursuant to Coverages D and F including full

reimbursement of all defense costs and indemnification for any judgment entered against Velsicol in the Underlying Action;

2.      Declaring that AISLIC breached its duty to defend Velsicol for claims made in the Underlying Action and that AISLIC is estopped form raising any policy defenses to the claims against Velsicol in the Underlying Action;

3.      Finding that AISLIC does not have a right to control Velsicol's defense in the Underlying Action but is obligated to pay for Velsicol's defense costs including reasonable attorney's fees, expert fees, and all other reasonable costs associated with the defense of the Underlying Action; and

4.      Granting such other and further relief as this Court deems just.

## COUNT II
## BAD FAITH

53.     Velsicol reasserts the allegations of paragraph 1 through 52 as the allegations of paragraph 53 of Count II.

54.     AISLIC's actions subsequent to Velsicol's tender of the defense of the Underlying Action and of plaintiff's policy limits demand have evinced a pattern and practice of unreasonable claims handling and are unreasonable and vexatious within the meaning of 215 ILCS 5/155 and constitute bad faith.

WHEREFORE, Plaintiff, Velsicol Chemical Corporation, requests that the Court enter judgment in its favor and against Defendant, American International Specialty Lines Insurance Company as follows:

1.      Finding that AISLIC has breached its contractual obligations under the Policy to Velsicol and awarding Velsicol the damages it has incurred arising from those breaches as proved at trial;

2.    Finding that AISLIC does not have a right to control Velsicol's defense in the Underlying Action but is obligated to pay for Velsicol's defense costs including reasonable attorney's fees, expert fees, and all other reasonable costs associated with the defense of the Underlying Action;

3.    Finding that AISLIC's conduct was unreasonable and vexatious within the meaning of 215 ILCS 5/155 entitling Velsicol to attorney's fees, other costs, plus the statutory penalty; and

4.    Granting such other and further relief as this Court deems just.

Respectfully Submitted,

Dated: May 15, 2008

**VELSICOL CHEMICAL CORPORATION**

By:  s/David B. Goodman  
     One of Its Attorneys

David B. Goodman (#6201242)  
S. Jarret Raab (#6294632)  
Rebecca J. Hanson (#6280296)  
SHAW GUSSIS FISHMAN GLANTZ  
  WOLFSON & TOWBIN LLC, *of counsel*  
321 North Clark Street  
Suite 800  
Chicago, Illinois  60610  
312-980-3865

08CV2822 TD
JUDGE SHADUR
MAGISTRATE JUDGE VALDEZ

# EXHIBIT 1



**AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE COMPANY**
A Capital Stock Insurance Company
(herein called the Company)
c/o American International Surplus Lines Agency, Inc.
Harborside Financial Center, 401 Plaza 3
Jersey City, NJ  07311

A Member Company
of American International Group, Inc.

**NAMED INSURED
AND**

**POST OFFICE**

Velsicol Chemical Corporation

10400 West Higgins Road
Rosemont, IL  60018

### POLLUTION LEGAL LIABILITY SELECT℠ CLEAN-UP COST CAP INSURANCE

### DECLARATIONS

### THIS IS A CLAIMS-MADE AND REPORTED POLICY - PLEASE READ CAREFULLY.

**POLICY NUMBER:**     PLS/CCC 476 16 84

MARSH USA INC.

RECEIVED
NOV 1 0 2003
MILWAUKEE, WI

Item 1:     **NAMED INSURED**     Velsicol Chemical Corporation
            **ADDRESS**          10400 West Higgins Road
                                 Rosemont, IL  60018

Item 2:     **POLICY PERIOD**     **FROM** <u>December 22, 1999</u> **TO** <u>December 22, 2009</u>
            12:01 A.M. Standard time at the address of the Named Insured shown above.

Item 3:     **COVERAGES AND COVERAGE SECTION LIMITS AND DEDUCTIBLES**

This Policy includes only those Coverages as stated in Section I of the Policy for which deductibles and limits of liability appear below.  If no deductible or limits of liability appears for a Coverage, that Coverage does not apply.

| Coverage | Deductible-Each Incident | Each Incident Limit | Coverage Section Aggregate Limit |
|----------|--------------------------|---------------------|----------------------------------|
| A | $500,000 | $50,000,000 | $100,000,000 |
| B | $500,000 | $50,000,000 | $100,000,000 |
| C | $500,000 | $50,000,000 | $100,000,000 |
| D | $500,000 | $50,000,000 | $100,000,000 |
| E | $500,000 | $50,000,000 | $100,000,000 |
| F | $500,000 | $50,000,000 | $100,000,000 |

74175 (7/99)

Copyright, American International Group, Inc., 1999

PAGE 1 OF 2

| Coverage | Deductible-Each Incident | Each Incident Limit | Coverage Section Aggregate Limit |
|---|---|---|---|
| G | $500,000 | $50,000,000 | $100,000,000 |
| H | $500,000 | $50,000,000 | $100,000,000 |
| I | $500,000 | $50,000,000 | $100,000,000 |
| J | $500,000 | $50,000,000 | $100,000,000 |
| M | $500,000/ per Claimant deductible as defined by endorsement #2 | $50,000,000 /Per Occurrence as defined by Endorsement #2 | $100,000,000 |

| Coverage | Limit of Liability | Self-Insured Retention | Co-Insurance Participation Percentage |
|---|---|---|---|
| K | $100,000,000 | See Schedule (Endorsement #9) | 0% |
| L | $100,000,000 | See Schedule (Endorsement #9) | 0% |

**Item 4:**    **POLICY AGGREGATE LIMIT:**    $100,000,000

**Item 5(a):**    **INSURED PROPERTY(IES) - COVERAGES A – J:**  See Endorsements  #1, #3  and  #4

**Item 5(b):**    **INSURED PROPERTY(IES) - COVERAGES K and L:**  See Endorsement #1

**Item 6:**    **POLICY PREMIUM**        $ 1,900,000

**Item 7:**    **RETROACTIVE DATE:**        Under Coverages A,B,C,D,E, F,G,H and I, the **Pollution Conditions** must commence on or after the date shown below.
  Retroactive Date:    None
        (Enter date or "none" if no Retroactive Date Applies.)

**Item 8:**    **CONTINUITY DATE:**        December 22, 1999

**Broker:**    Marsh, Inc.
        500 West Monroe
        Chicago, IL  60661



AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

**FORMS SCHEDULE**

Named Insured:          Velsicol Chemical Corporation

Policy No:               PLS/CCC 476 16 84

Effective 12:01 AM,      December 22, 1999

| Form Name | Form Number |
|---|---|
| American International Specialty Lines Insurance Company Declarations | 74175 (7/99) |
| American International Specialty Lines Insurance Company Policy | MNSCPT |
| Notice of Loss/Notice of Claim | CI1141 (9/00) |
| Schedule of Insured Properties and Corresponding SIRS Endorsement | MNSCPT |
| Products Liability Endorsement | MNSCPT |
| Insured Properties and Corresponding "Sub-Aggregate Deductible" | MNSCPT |
| Named Insured Endorsement | MNSCPT |
| Additional Named Insured Endorsement | MNSCPT |
| Fruit of the Loom Divested Properties Endorsement | MNSCPT |
| Schedule of Insured Contracts | MNSCPT |
| Joint Defense Endorsement | MNSCPT |
| Service of Suit - Illinois | MNSCPT |
| Schedule of "Your Products" Endorsement | MNSCPT |
| Non-Owned Locations Endorsement | MNSCPT |

# AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

## VELSICOL
## POLLUTION LEGAL LIABILITY SELECT℠ POLICY
## TABLE OF CONTENTS*

SECTION I. - INSURING AGREEMENTS................................................................. 1

1.  COVERAGES

    COVERAGE A - ON-SITE  CLEAN-UP OF PRE-EXISTING CONDITIONS.................. 1

    COVERAGE B - ON-SITE CLEAN-UP OF NEW CONDITIONS ...................................... 2

    COVERAGE C - THIRD-PARTY CLAIMS FOR ON-SITE BODILY INJURY AND
    PROPERTY DAMAGE.......................................................................................... 2

    COVERAGE D - THIRD-PARTY CLAIMS FOR OFF-SITE
    CLEAN-UP RESULTING FROM PRE-EXISTING CONDITIONS ..................................... 3

    COVERAGE E - THIRD-PARTY CLAIMS FOR OFF-SITE
    CLEAN-UP RESULTING FROM NEW CONDITIONS ...................................................... 3

    COVERAGE F- THIRD-PARTY CLAIMS FOR OFF-SITE
    BODILY INJURY AND PROPERTY DAMAGE .............................................................. 3

    COVERAGE G - THIRD-PARTY CLAIMS FOR ON-SITE
    CLEAN-UP COSTS - NON-OWNED LOCATIONS .......................................................... 3

    COVERAGE H- THIRD-PARTY CLAIMS FOR OFF-SITE
    BODILY INJURY, PROPERTY DAMAGE OR CLEAN-UP
    COSTS - NON-OWNED LOCATIONS ............................................................................ 3

    COVERAGE I - POLLUTION CONDITIONS RESULTING FROM TRANSPORTED
    CARGO ............................................................................................................ 3

---

*The captions contained in this Table of Contents are included solely for the convenience of the reader and do not include all the terms, exclusions and conditions of the Policy.  Refer to the Policy itself for a description of the scope and limitations of coverage.

Copyright, American International Group, Inc., 2000

COVERAGE J - FIRST PARTY CLAIMS FOR ON-SITE PROPERTY DAMAGE ....... 4

COVERAGE K - CLEAN-UP COST CAP - KNOWN POLLUTANTS........................ ....... 4

COVERAGE L - CLEAN-UP COST CAP - UNKNOWN POLLUTANTS......................... 4

COVERAGE M – PRODUCTS LIABILITY COVERAGE.......SEE ENDORSEMENT #2

2.      LEGAL EXPENSE AND DEFENSE .......................................................................... 5

SECTION II.           NOTICE REQUIREMENTS AND CLAIM PROVISIONS ......................... 5

   A.      Notice of Pollution Conditions, Claims and Pollutants .............................................. 6

   B.      Notice of Possible Claim.........................................................................……....6

SECTION III.          RIGHTS OF THE COMPANY AND DUTIES OF THE
                      INSURED IN THE EVENT OF POLLUTION CONDITIONS
                      AND IN CONNECTION WITH REMEDIAL ACTIVITIES ...................... 7

   A.      Pollution Conditions - Coverages A through J and Coverage M.............................. 7

   B.      Remedial Activities - Coverages K and L............ .............................................. 8

SECTION IV.           EXCLUSIONS .................................................................................... 9

            1.        COMMON EXCLUSIONS - APPLICABLE TO
                      ALL COVERAGES .................................................................... 9

            2.        COVERAGE I EXCLUSIONS ...................................................... 11

            3.        COVERAGE K AND L EXCLUSIONS.......... .............................. 12

            4.        COVERAGE M EXCLUSIONS..........SEE ENDORSEMENT #2

SECTION V.            LIMITS OF COVERAGE; DEDUCTIBLE ...................................... 14

            A.        Policy Aggregate Limit ........................................................... 14
            B.        Each Incident Limit - Coverages A through J and M.................... 14
            C.        Coverage Section Aggregate Limit........................................... 15
            D.        Maximum for Clean-Up Cost Cap.............................................. 15
            E.        Multiple Coverages ................................................................. 15
            F.        Deductible ............................................................................. 15

SECTION VI.           DEFINITIONS......................................................................... 16

SECTION VII.          CONDITIONS ............................................................................20

Copyright, American International Group, Inc., 1999

SECTION VIII.    EXTENDED REPORTING PERIOD FOR CLAIMS - COVERAGES A THROUGH J and M ........................................................ 26

    A.   Automatic Extended Reporting Period ............................................ 27

    B.   Optional Extended Reporting Period ................................................ 27

Copyright, American International Group, Inc., 1999

**AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**
(A Capital Stock Company, herein called the Company)
175 Water Street, Twelfth Floor
New York, New York 10038

VELSICOL

## POLLUTION LEGAL LIABILITY SELECT℠ POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY. THIS POLICY HAS CERTAIN PROVISIONS AND REQUIREMENTS UNIQUE TO IT AND MAY BE DIFFERENT FROM OTHER POLICIES THE INSURED MAY HAVE PURCHASED. DEFINED TERMS APPEAR IN BOLD FACE TYPE.**

**NOTICE: THE DESCRIPTIONS IN ANY HEADINGS OR SUB-HEADINGS OF THIS POLICY ARE INSERTED SOLELY FOR CONVENIENCE AND DO NOT CONSTITUTE ANY PART OF THE TERMS OR CONDITIONS HEREOF.**

In consideration of the payment of the premium, in reliance upon the statements in the Declarations and the Application annexed hereto and made a part hereof, and pursuant to all of the terms of this Policy, the Company agrees with the **Named Insured** as follows:

I. **INSURING AGREEMENTS**

    1. **COVERAGES**

    **THE FOLLOWING COVERAGES ARE IN EFFECT ONLY IF SCHEDULED IN THE DECLARATIONS:**

**COVERAGE A - ON-SITE CLEAN-UP OF PRE-EXISTING CONDITIONS**

1. To pay **Clean-Up Costs** on behalf of the **Insured**, on or under the **Insured Property**, if such **Clean-Up Costs** are sustained solely by reason of the discovery by the **Insured** during the **Policy Period** of **Pollution Conditions** on or under the **Insured Property** which commenced prior to **Continuity Date**, provided:

    (a) The discovery of such **Pollution Conditions** is reported to the Company in writing during the **Policy Period** or within thirty (30) days thereafter by the **Insured** and in accordance with Section II of the Policy;

        Discovery of such **Pollution Conditions** happens when any director or officer or Risk Manager or General Counsel, or manager of Environmental Affairs of the **Named Insured** or in the case of a proprietorship or partnership, an owner or general partner, becomes aware of such **Pollution Conditions**;

    (b) Such **Pollution Conditions** have been reported to the appropriate governmental agency if required by applicable **Environmental Laws**, in effect as of the date of discovery.

2. To pay **Loss** on behalf of the **Insured** that the **Insured** is legally obligated to pay as a result of

Copyright, American International Group, Inc., 1999

**Claims** first made against the **Insured** and reported to the Company, in writing, during the **Policy Period,** or during the **Extended Reporting Period** if applicable, for **Clean-Up Costs** on or under the **Insured Property** resulting from **Pollution Conditions** on or under the **Insured Property** which commenced prior to the **Continuity Date.**

## COVERAGE B - ON-SITE CLEAN-UP OF NEW CONDITIONS

1.      To pay **Clean-Up Costs** on behalf of the **Insured,** on or under the **Insured Property,** if such **Clean-Up Costs** are sustained solely by reason of the discovery by the **Insured** during the **Policy Period** of **Pollution Conditions** on or under the **Insured Property** which commenced on or after the **Continuity Date,** provided:

   (a)   The discovery of such **Pollution Conditions** is reported to the Company in writing during the **Policy Period** or within thirty (30) days thereafter by the **Insured** and in accordance with Section II of the Policy;

         Discovery of such **Pollution Conditions** happens when any director or officer or Risk Manager or General Counsel, or manager of Environmental Affairs of the **Named Insured** or in the case of a proprietorship or partnership, an owner or general partner, becomes aware of such **Pollution Conditions;**

   (b)   Such **Pollution Conditions** have been reported to the appropriate governmental agency if required by applicable **Environmental Laws,** in effect as of the date of discovery.

2.      To pay **Loss** on behalf of the **Insured** that the **Insured** is legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company, in writing, during the **Policy Period,** or during the **Extended Reporting Period** if applicable, for **Clean-Up Costs** on or under the **Insured Property** resulting from **Pollution Conditions** on or under the **Insured Property** which commenced on or after the **Continuity Date.**

## COVERAGE C - THIRD PARTY CLAIMS FOR ON-SITE BODILY INJURY AND PROPERTY DAMAGE

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period,** or during the **Extended Reporting Period** if applicable, for **Bodily Injury,** or **Property Damage** to **Personal Property** of third-parties caused by **Pollution Conditions** on or under the **Insured Property,** if such **Bodily Injury** or **Property Damage** takes place while the person injured or **Personal Property** damaged is on the **Insured Property.**

## COVERAGE D - THIRD PARTY CLAIMS FOR OFF-SITE CLEAN-UP RESULTING FROM PRE-EXISTING CONDITIONS

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period,** or

Copyright, American International Group, Inc., 2000

during the **Extended Reporting Period** if applicable, for **Clean-Up Costs** beyond the boundaries of the **Insured Property** resulting from **Pollution Conditions** which commenced prior to the **Continuity Date.**

## COVERAGE E - THIRD PARTY CLAIMS FOR OFF-SITE CLEAN-UP RESULTING FROM NEW CONDITIONS

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable, for **Clean-Up Costs** beyond the boundaries of the **Insured Property** resulting from **Pollution Conditions** which commenced on or after the **Continuity Date.**

## COVERAGE F - THIRD PARTY CLAIMS FOR OFF-SITE BODILY INJURY AND PROPERTY DAMAGE

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable, for **Bodily Injury** or **Property Damage** beyond the boundaries of the **Insured Property** that result from **Pollution Conditions** on or under the **Insured Property** which have migrated beyond the boundaries of the **Insured Property.**

## COVERAGE G - THIRD-PARTY CLAIMS FOR ON-SITE CLEAN-UP COSTS - NON-OWNED LOCATIONS

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during **Extended Reporting Period** if applicable, for **Clean-Up Costs** on or under a **Non-Owned Location** resulting from **Pollution Conditions** on or under such **Non-Owned Location.**

## COVERAGE H - THIRD PARTY CLAIMS FOR OFF-SITE BODILY INJURY, PROPERTY DAMAGE OR CLEAN-UP COSTS - NON-OWNED LOCATIONS

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable, for **Bodily Injury, Property Damage** or **Clean-Up Costs** beyond the boundaries of a **Non-Owned Location** resulting from **Pollution Conditions** on or under such **Non-Owned Location**, which have migrated beyond the boundaries of such **Non-Owned Location.**

## COVERAGE I - POLLUTION CONDITIONS RESULTING FROM TRANSPORTED CARGO

To pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable, for **Bodily Injury, Property Damage** or **Clean-Up Costs** resulting from **Pollution Conditions** from **Transported Cargo.**

## COVERAGE J - FIRST PARTY CLAIMS FOR ON SITE PROPERTY DAMAGE

Copyright, American International Group, Inc., 2000

3

The Company agrees to pay the **Insured** for **Loss** arising from **Property Damage** to the **Insured Property** or to **Personal Property** that is on the **Insured Property**, provided the **Pollution Conditions** are on or under the **Insured Property** and discovered by the **Insured** during the **Policy Period**.

Discovery of such **Pollution Conditions** happens when any director or officer or Risk Manager or General Counsel, or manager of Environmental Affairs of the **Named Insured** or in the case of a proprietorship or partnership, an owner or general partner, becomes aware of such **Pollution Conditions**.

## COVERAGE K - CLEAN-UP COST CAP - KNOWN POLLUTANTS

To indemnify the **Insured** for **Loss** which the **Insured** sustained for **Clean-Up Costs** the **Insured** first incurs or is liable for, on or after October 1, 1999 and before the **Termination Date**:

(a)    At an **Insured Property** pursuant to the **Remedial Action Plan**; or

(b)    Beyond the boundaries of the **Remedial Action Plan** if such **Clean-Up Costs** are incurred in the **Clean-Up** of **Pollutants** which were discovered through and originated from the performance of the **Remedial Action Plan.**

This coverage applies only if the following conditions are satisfied:

1.    The **Insured** reports the **Clean-Up Costs** to the Company prior to the **Termination Date**, in accordance with Section II.A. of the Policy; and

2.    The **Insured** provides the Company with progress reports, including work completed and costs incurred to date on at least a calendar quarter basis on the progress of the **Remedial Action Plan** and the **Clean-Up Costs** the **Named Insured** incurred or is liable for under this Coverage K.

## COVERAGE L - CLEAN-UP COST CAP - UNKNOWN POLLUTANTS

To indemnify the **Insured** for **Loss** which the **Insured** sustained for **Clean-Up Costs** the **Insured** first incurs or is liable for, on or after the **Inception Date** and before the **Termination Date**, for **Pollutants** different from those identified for remedial action in the **Remedial Action Plan** for a **Clean-Up** at an **Insured Property.**

This Coverage applies only if all the following conditions are satisfied:

1.    The **Pollutants** originated from an **Insured Property**;

2.    The **Pollutants** are first discovered in the course of performing a **Clean-Up** pursuant to the **Remedial Action Plan** at an **Insured Property**; and

3.    The **Insured** reports the discovery of such **Pollutants** to the Company no later than sixty (60) days after discovery of such **Pollutants** and in any event before the **Termination Date**, in accordance with Section II.A. of this Policy.

Copyright, American International Group, Inc., 2000

4

Discovery of such **Pollution Conditions** happens when any director or officer or Risk Manager or General Counsel, or manager of Environmental Affairs of the **Named Insured** or in the case of a proprietorship or partnership, an owner or general partner, becomes aware of such **Pollution Conditions**

## COVERAGE M- PRODUCTS LIABILITY COVERAGE –(SEE ENDORSEMENT #2)

### 2.    LEGAL EXPENSE AND DEFENSE

The Company shall have the right and the duty to defend any **Claims** covered under Coverages A through I and Coverage M provided the **Named Insured** has purchased such Coverage. The Company shall also have the right and duty to defend **Loss** under Coverage K and L for modifications to the **Remedial Action Plan** required by the governmental entity responsible for supervision of the **Clean-Up**. The Company's duty to defend or continue defending any such **Claim**, and to pay any **Loss**, shall cease once the applicable limit of liability, as described in Section V. (Limits of Coverage; Deductible) has been exhausted. Defense costs, charges and expenses provided under all Coverage Sections, including Coverage M, are included in **Loss** and reduce the applicable limit of liability, as described in Section V., and are included within the Deductible amount for the Coverage Section which applies and is shown in Item 3 of the Declarations. The **Insured** has the right to choose counsel for **Loss** that are within the Self Insured Retention for Coverages K and L; further the Company agrees to allow mutually acceptable counsel (including pre-approved counsel) to defend the **Insured** for all other Covered **Claims** or **Loss** under this policy. If mutual agreement can not be met the Company will have the ultimate right to appoint counsel.

In the event the **Insured** is entitled by law to select independent counsel to defend the **Insured** at the Company's expense, the attorney fees and all other litigation expenses the Company must pay to that counsel are limited to the rates the Company would actually pay to counsel that the Company retains in the ordinary course of business in the defense of similar **Claims** in the community where the **Claim** arose or is being defended.

The Company may exercise the right to require that such counsel have certain minimum qualifications with respect to their competency, including experience in defending **Claims** similar to the one pending against the **Insured**, and to require such counsel to have errors and omissions insurance coverage. As respects any such counsel, the **Insured** agrees that counsel will timely respond to the Company's request for information regarding the **Claim**. The **Insured** may at any time, by its signed consent, freely and fully waive its right to select independent counsel.

If the **Insured** refuses to consent to any settlement within the limits of liability of this Policy recommended by the Company and acceptable to the claimant, the Company's duty to defend the **Insured** shall then cease and the **Insured** shall thereafter negotiate or defend such **Claim** independently of the Company and the Company's liability shall not exceed the amount, less the Deductible or any outstanding Deductible balance, for which the **Claim** could have been settled if such recommendation was consented to.

### II.    NOTICE REQUIREMENTS AND CLAIM PROVISIONS

It is a condition precedent to any rights afforded under this Policy that the **Insured** provide the

Company with notice of **Pollution Conditions**, **Claims** and the discovery of **Pollutants** as follows:

**A.    NOTICE OF POLLUTION CONDITIONS, CLAIMS AND POLLUTANTS**

1.    In the event of **Pollution Conditions** under Coverages A through J, a **Claim** under Coverages A through J and Coverage M , or the discovery of **Pollutants** at or beyond the boundaries of an **Insured Property** under Coverages K or L, the Insured shall give written notice to:

Manager, Pollution Insurance Products Unit
AIG Technical Services, Inc.
Environmental Claims Department
80 Pine Street, Sixth Floor
New York, New York 10005

and

Division Attorney - Pollution Legal Liability
American International Specialty Lines Insurance Company
175 Water Street, Twelfth Floor
New York, New York 10038

or other address(es) as substituted by the Company in writing.

2.    The **Insured** shall give notice of **Pollution Conditions** as soon as practicable and such notice shall include, at a minimum, information sufficient to identify the **Named Insured**, the **Insured Property**, the names of persons with knowledge of the **Pollution Conditions** and all known and reasonably obtainable information regarding the time, place, cause, nature of and other circumstances of the **Pollution Conditions**

3.    The **Insured** shall give notice of **Claims** as soon as practicable, but in any event during the **Policy Period** or **Extended Reporting Period**, if applicable. The **Insured** shall furnish information at the request of the Company. When a **Claim** has been made, the **Insured** shall forward/provide access to the following to the Company as soon as practicable:

a.    All reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the claimant(s) and available witnesses.

b.    All demands, summonses, notices or other process or papers filed with a court of law, administrative agency or an investigative body;

c.    Other information in the possession of the **Insured** or its hired experts which the Company reasonably deems necessary.

Copyright, American International Group, Inc., 2000

**B.**     **NOTICE OF POSSIBLE CLAIM**

    1.    If during the **Policy Period**, the **Insured** first becomes aware of **Pollution Conditions** which it reasonably expects may result in a **Claim** under one or more of Coverages C through I which the **Named Insured** has purchased, the **Insured** may provide written notice to the Company during the **Policy Period** containing all the information required under paragraph 2) below. Any **Claim** subsequently made against the **Insured** and reported to the Company within five (5) years after the end of the **Policy Period** of this Policy or any continuous, uninterrupted renewal thereof, shall be deemed to have been first made and reported during the **Policy Period** of this Policy. Such **Claim** shall be subject to the terms, conditions and limits of coverage of this Policy.

    2.    It is a condition precedent to the coverage afforded by this Clause that the Insured will make a good faith effort to provide written notice of **Pollution Conditions** or a **Claim** under paragraph 1) above which contains all of the following information: (a) the cause of the **Pollution Conditions**; (b) the **Insured Property** upon which the **Pollution Conditions** took place; (c) the **Bodily Injury, Property Damage** or **Clean-Up Costs** which has resulted or may result from such **Pollution Conditions**; (d) the **Insured(s)** which may be subject to the **Claim** and any potential claimant(s); (e) all engineering information available on the **Pollution Conditions** and any other information that the Company deems reasonably necessary; and (f) the circumstances by which and the date the **Insured** first became aware of the potential **Claim**.

**III.**     **RIGHTS OF THE COMPANY AND DUTIES OF THE INSURED IN THE EVENT OF POLLUTION CONDITIONS AND IN CONNECTION WITH REMEDIAL ACTIVITIES**

    **A.**     **Pollution Conditions - Coverages A Through J and Coverage M**

        1.    The Company's Rights

            (a)    The Company shall have the right but not the duty to clean up or mitigate **Pollution Conditions** upon receiving notice as provided in Section II of this Policy, if the **Loss (es)** is (are) estimated by the Company, in consultation with the **Insured**, at any time to be or is (are) already in excess of the **Self Insured Retention or Deductible.**

            (b)    Allocation of Sums Expended. Any sums expended by the Company under Paragraph A.1.(a) of this Section III will be deemed incurred or expended by the **Insured** and shall be applied against the limits of coverage under this Policy. The **Insured** shall promptly reimburse the Company for advancing any element of **Clean-Up Costs** or **Loss** falling within the Deductible which shall not be expended without consultation of the **Insured**.

        2.    The **Named Insured** shall have the duty to clean up **Pollution Conditions** to the

extent required by **Environmental Laws** or the controlling government agency, by retaining competent professional(s) or contractor(s) mutually acceptable to the Company and the **Named Insured**. The Company shall have the right but not the duty to review and approve all aspects of any such clean-up. The **Named Insured** shall notify the Company of actions and measures taken pursuant to this paragraph. Memphis Environmental Center is a pre-approved environmental contractor under this paragraph.

**B.    Remedial Activities - Coverages K and L**

1.    The Company shall have the right, but not the duty, to review, assess and inspect all aspects of any **Clean-Up** to which Coverages K or L apply, regardless of whether the **Insured** has incurred **Clean-Up Costs** in excess of the **Self-Insured Retention**. Neither the Company's rights nor its exercise of the rights under this paragraph shall constitute an undertaking to determine or warrant that the **Clean-Up** is safe, healthful, or in conformity with applicable law.

2.    The **Insured** shall: (a) take all reasonable and prudent steps to minimize the **Clean-Up Costs**; (b) limit access to the **Insured Property** and prevent the spread of further contamination; (c) retain competent professional(s) or contractor (s) acceptable to the Company and the **Insured** to undertake and complete **Clean-Up**; (d) keep detailed records of all **Clean-Up Costs**; and (e) to the extent of the **Insured's** legal right of access, permit the Company to inspect the **Insured Property**, as often as the Company chooses, after providing reasonable notice, and inspect all financial records, drawings, plans and specifications involved in the **Loss**. The Company's site inspections shall be in compliance with any health and safety plan or requirements for the site plans or requirements, which the **Insured** will submit to the Company as least seven ( 7) days prior to the inspection.

3.    The **Insured** shall cooperate with the Company by providing the Company with access to:

(a)    All information developed or discovered by the **Insured** concerning the **Clean-Up**, whether or not deemed by the **Insured** to be relevant;

(b)    Free access to interview any agent, servant or employee of the **Insured** or any contractor or subcontractor involved in the **Clean-Up**; and

(c)    Any other information or other reasonable requests from the Company concerning the **Clean-Up**.

## IV.    EXCLUSIONS

### 1.    COMMON EXCLUSIONS - APPLICABLE TO ALL COVERAGES

Unless otherwise provided in the Exclusions below, this Policy does not apply to **Clean-Up Costs**,

Copyright, American International Group, Inc., 2000

**Claims,** or **Loss:**

A.  PUNITIVE DAMAGES; FINES/PENALTIES:

due to or for any punitive, exemplary or the multiplied portion of multiple damages, or any civil or administrative fines, penalties or assessments, except where such damages, fines, penalties or assessments are insurable by applicable law; or any criminal fines, penalties or assessments.   It is hereby agreed that the term "assessments", does not mean **Clean-Up Costs** as defined in the Policy.  It is further agreed that this exclusion does not apply to any punitive damages that results from an act of the Company, at the direction of the Company, or from an act performed by a contractor at the request of the Company.

B.  CONTRACTUAL LIABILITY:

arising from liability of others assumed by the **Insured** under any contract or agreement, unless the liability of the **Insured** would have attached in the absence of such contract or agreement or the contract or agreement is an **Insured Contract**.

C.  TRANSPORTATION:

except with respect to Coverage I, arising out of the ownership, maintenance, use, operation, loading or unloading of any conveyance beyond the boundaries of the **Insured Property**.

D.  ABANDONED PROPERTY:

arising from **Pollution Conditions** on, under or originating from any **Insured Property** and which commence subsequent to the time the **Insured Property** is abandoned by any **Insured**.

E.  WILLFUL AND ILLEGAL ACTS:

resulting from **Pollution Conditions** that result from a willful act or omission or a willful illegal act or omission of a **Responsible Insured,** if he or she knew or could have reasonably foreseen that the **Pollution Conditions** would result.

F.  NONCOMPLIANCE:

arising from **Pollution Conditions** based upon or attributable to any **Responsible Insured's** intentional, willful or deliberate noncompliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body if he or she knew or could have reasonably expected that the **Claim** or **Loss** would result.  However, with respect to Coverages K and L, this exclusion does not apply to such noncompliance which resulted in the necessity for the **Remedial Action Plan**.  This

Copyright, American International Group, Inc., 2000

9

exclusion also does not apply to Divested Entities as scheduled onto the Policy by endorsement

G.   INTERNAL EXPENSES:

for costs, charges or expenses incurred by the **Insured** for goods supplied or services performed by the staff or salaried employees of the **Insured**, or its parent, subsidiary or affiliate, except if in response to an emergency or pursuant to **Environmental Laws** which require immediate remediation of **Pollution Conditions**, or unless such costs, charges or expenses are incurred with the prior written approval of the Company in its sole discretion. Approval of costs, charges or expenses incurred by the **Insured** for goods supplied or services performed by the staff or salaried employees of the **Insured**, or its parent, subsidiary or affiliate will not be unreasonably withheld. This exclusion does not apply to Memphis Environmental Center.

H.   INSURED vs. INSURED:

by any **Insured** against any other person or entity who is also an **Insured** under this Policy.

I.   ASBESTOS AND LEAD:

except with respect to Coverages K and L, arising from the presence of asbestos or any asbestos-containing materials or lead-based paint installed or applied in, on or to any building or other structure.

J.   EMPLOYER LIABILITY:

arising from **Bodily Injury** to any past or present employees of the **Insured** or its parent, subsidiary or affiliate arising out of and in the course of employment by the **Insured** or its parent, subsidiary or affiliate. This exclusion applies whether the **Insured** may be liable as an employer or in any other capacity and to any obligation to share damages with or repay third parties who must pay damages because of the injury.

Copyright, American International Group, Inc., 2000

K.    PRIOR KNOWLEDGE/DISCLOSURE:

solely with respect to Coverages A through J , for **Clean-Up Costs** resulting from **Pollution Conditions** existing prior to the inception of this Policy and disclosed in the application for this Policy and due diligence performed by the Company at any **Insured Property(ies)** scheduled for Coverages K and L.  This exclusion will not apply to the following:

**Loss** resulting from **Pollution Conditions** arising from or **Pollutants** on, under or migrating from **Insured Property(ies)** scheduled for Coverages K and L after the **Insured** has received written approval from the governmental entity responsible for supervision of the **Cleanup** that the **Cleanup** has been completed in accordance with the **Remedial Action Plan** and no further remediation is required;

L.    REMEDIAL ACTION PLAN:

solely with respect to Coverages A through J and M, arising from or discovered in the course of performance of a **Remedial Action Plan** covered under either Coverage K or L, or which, but for the amount thereof, would be covered under either of such Coverages.

M.    PRIOR KNOWLEDGE NON DISCLOSURE:

arising from **Pollution Conditions** existing prior to the inception date of this Policy and not disclosed in the application or any information attached thereto for this Policy or any engineering materials made available to the Company prior to the inception date of this Policy, if any **Responsible Insured** knew or reasonably could have expected that such **Pollution Conditions** could materially affect **Clean-Up Costs**, or give rise to a **Claim** under this Policy.

N.    PRODUCTS LIABILITY COVERAGE –ANTI STACKING

Solely with respect to coverages A through L,  for **Bodily Injury**, **Property Damage**, or **Clean-Up Costs** which is included in the "Products Hazard" as that term is defined in Endorsement 2, Coverage M.

2.    **COVERAGE I EXCLUSIONS**

The following exclusions apply to Coverage I.

This Policy does not apply to **Claims** or **Loss**:

A.    PROPERTY DAMAGE TO CONVEYANCES:

for **Property Damage** to any conveyance utilized during the **Transportation** of

Copyright, American International Group, Inc., 2000
11

**Cargo.** This exclusion does not apply to **Claims** made by third-party carriers of the **Insured** for such **Property Damage** arising from the **Insured's** negligence, or strict liability imposed by **Environmental Laws.**

B.    POLLUTION CONDITIONS PRIOR OR SUBSEQUENT TO TRANSPORTATION OF CARGO:

arising from a **Pollution Condition:**

(1)    which commences prior to the **Transportation of Cargo;** or

(2)    which commences  after **Cargo** reaches its final destination, or while the **Cargo** is in storage off-loaded from the conveyance which was transporting it.

C.    THIRD-PARTY CARRIER CLAIMS:

made by a third-party carrier, its agents or employees, for **Bodily Injury, Property Damage** or **Clean-Up Costs,** whether or not the **Bodily Injury, Property Damage** or **Clean-Up Costs** were directly incurred by such third-party carrier. This exclusion does not apply to **Claims** arising from the **Insured's** negligence or strict liability imposed by **Environmental Laws.**

3.    **COVERAGE K AND L EXCLUSIONS**

The following exclusions apply to Coverages K and L.

This Policy does not apply to **Clean-Up Costs:**

A.    BODILY INJURY OR PROPERTY DAMAGE

arising from any **Bodily Injury** or **Property Damage.**  This exclusion does not apply to cost for **Property Damage** that were specifically detailed and disclosed as part of the **Remedial Action Plan.**

B.    LIABILITY TO THIRD-PARTIES

arising from any liability to any third-party for any reason whatsoever, other than **Clean-Up Costs** otherwise contemplated in the **Remedial Action Plan.**

C.    WAR

arising from any consequence, whether direct or indirect, of war, invasion, act of foreign enemy, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection or military or usurped power, strike, riot or civil commotion.

Copyright, American International Group, Inc., 2000

12

D.    DELAY, DEFAULT, SUSPENSION, DEFECTS

arising from:

1.    Suspension, lapse, modification or cancellation of any license, permit, lease or contract which is required by the governmental entity responsible for supervision of the **Clean-Up;**

2.    Suspension of operations or prohibition of access to an **Insured Property** by order of governmental authority;

3.    Unreasonable time delay in a contractor's performance of **Clean-Up,** as defined by contract, if such delay is within the control of the contractor performing the **Clean-Up;**

if the above listed items in 1.,2., and 3 are within the control of the **Named Insured(s).**

E.    MODIFICATION OF REMEDIAL ACTION PLAN

arising from any modification of the **Remedial Action Plan** made by the **Named Insured,** unless:

1.    Such modification is required by the governmental entity responsible for supervision of the **Clean-Up;** or

2.    The Company has consented to such modification in advance, in writing.

F.    OTHER APPLICABLE COVERAGE(S)

covered under any of Coverages A through I, or which, but for the amount thereof, would be covered under any of such Coverages.

G.    PRIOR CLEAN UP COSTS

any **Clean-Up Costs** expended prior to October 1, 1999.

## V.    LIMITS OF COVERAGE; DEDUCTIBLE

Regardless of the number of **Claims,** claimants, **Pollution Conditions, Insureds** or **Insured Property** under this Policy, the following limits of liability apply:

Copyright, American International Group, Inc., 2000

**A.     Policy Aggregate Limit**

The Company's total liability for all **Clean-Up Costs** and **Loss**, under Coverages A through J and M, and Coverages K and L shall not exceed the "Policy Aggregate" stated in Item 4 of the Declarations.

**B.     Each Incident Limit - Coverages A Through J and Coverage M**

(1)     Subject to Paragraph V.A. above, the most the Company will pay for all **Loss** under each Coverage in Coverages A through J and Coverage M arising from the same, related or continuous **Pollution Conditions**, is the "Each Incident" limit of coverage for that particular coverage stated in Item 3 of the Declarations.

(2)     If the **Insured** first discovers **Pollution Conditions** during the **Policy Period** and reports them to the Company in accordance with Section II., all continuous or related **Pollution Conditions** first discovered by the **Named Insured** and reported to the Company under a subsequent Pollution Legal Liability Policy issued by the Company or its affiliate providing substantially the same coverage as this Policy shall be deemed to have been first discovered and reported during the **Policy Period**.

(3)     If a **Claim** for **Bodily Injury, Property Damage**, or **Clean-Up Costs** is first made against the **Insured** and reported to the Company during the **Policy Period**, all **Claims** for **Bodily Injury, Property Damage** or Clean-Up Costs, arising from the same, continuous or related **Pollution Conditions** which are first made against the **Insured** and reported under a subsequent Pollution Legal Liability Policy issued by the Company or its affiliate providing substantially the same coverage as this Policy, shall be deemed to have been first made and reported during this **Policy Period**. Coverage under this Policy for such **Claims** shall not apply, however, unless at the time such **Claims** are first made and reported, the **Insured** has maintained with the Company or its affiliate Pollution Legal Liability coverage substantially the same as this coverage on a continuous, uninterrupted basis since the first such **Claim** was made against the **Insured** and reported to the Company.

**C.     Coverage Section Aggregate Limit**

Subject to Paragraph V.A. above, the Company's total liability for all **Clean-Up Costs** under Coverages A and B, and for all **Loss** under each Coverage in Coverages A through J and Coverage M, shall not exceed the "Coverage Section Aggregate" limit of coverage for that particular coverage stated in Item 3 of the Declarations.

**D.     Maximum for Clean-Up Cost Cap**

1.     Subject to Paragraph V.A. above, the maximum amount for which the Company is liable for all **Loss** under Coverages K and L is the Company's Limit of Liability stated in Item 3 of the Declarations, regardless of whether or not the **Insured** is

Copyright, American International Group, Inc., 2000
14

financially unable, or is unwilling to pay its **Self-Insured Retention**.   The **Self-Insured Retention** is to be borne by the **Insured** and is not to be insured.

2.   Subject to and as part of the Company's limit of liability under Coverages K and L described in paragraph V.D.(1) above, the most the Company will pay for costs, charges or expenses expended for the preparation of a remedial action plan, if any, under Coverage L, shall not exceed 100% of the Company's total liability under Coverage L.

E.   **Multiple Coverages**

Subject to Paragraph V.A. above, if the same, related or continuous **Pollution Conditions** result in coverage under more than one Coverage Section under Coverages A through J and Coverage M,   every applicable "Each Incident," limit of coverage among such coverage sections shall apply to the **Clean-Up Costs**, or **Loss**, whichever is applicable, resulting from such **Pollution Conditions**.

F.   **Deductible/Self-Insured Retention**

(1)   **Coverages A through J and Coverage M**
Subject to Paragraphs V.A. through V.E. above, this Policy is to pay covered damages included within the **Products Hazard, Clean-Up Costs, or Loss**, as the case may be, in excess of the Deductible amount stated in Item 3 of the Declarations for that particular coverage, up to but not exceeding the applicable "Each Incident" limit of coverage.   The Deductible amount applies to all covered damages, **Clean-Up Costs** or **Loss** arising from the same, related or continuous **Pollution Conditions**.

If the same, related or continuous **Pollution Conditions** result in coverage under more than one coverage section in Coverages A through J and Coverage M, only the highest Deductible amount stated in Item 3 of the Declarations among all the coverage sections applicable to the **Claim** will apply.

The **Insured** shall promptly reimburse the Company for advancing any element of **Clean-Up Costs** or **Loss** falling within the Deductible which shall not be expended without consultation of the **Insured**.

(2)   **Coverages K and L**

Subject to Paragraphs V.A. through V.-E. above, this Policy is to pay **Clean-Up Costs** under Coverages K and L in excess of the **Self-Insured Retention** or any Sub Self Insured Retention if added by endorsement during the term of this policy.

G.   **Covered under Fruit of the Loom Policy**

Subject to Paragraph V.A. above, and notwithstanding the applicable "Each Incident Limit of

Copyright, American International Group, Inc., 2000

Liability" and the "Coverage Section Limit of Liability" if the same, related or continuous **Pollution Conditions** result in coverage under this Policy and Fruit of the Loom American International Specialty Lines Insurance Company Policy PLS 267 53 70 the Company's total liability for all **Clean-up Costs** or **Loss** under both policies shall not exceed $50,000,000 for the same applicable Coverage Section under both Policies and $100,000,000 in the aggregate.

## VI.    DEFINITIONS

A.    **Bodily Injury** means physical injury, or sickness, disease, mental anguish or emotional distress, sustained by any person, including death resulting therefrom.

B.    **Cargo** means goods, products or wastes transported for delivery by a carrier properly licensed to transport such goods, products or wastes.

C.    **Claim** means a written demand received by the **Insured** seeking a remedy and alleging liability or responsibility on the part of the **Insured** for **Loss** under Coverages A through I. Section 104 CERCLA Potential Responsible Party letters or any other equivalent notifications in accordance with applicable **Environmental Laws** will also constitute a **Claim** under this Policy.

D.    **Clean-Up**, as used in Coverages K and L, means the removal, disposal, treatment (including in situ treatment) remediation, monitoring or neutralization of **Pollutants** required under any **Remedial Action Plan**.

E.    **Clean-Up Costs** means:

(1)    with respect to Coverages A through J and Coverage M, reasonable and necessary costs, charges and expenses, including reasonable and necessary legal expenses and consulting expenses incurred with the Company's written consent, incurred or paid in by the Company in any settlement or compromise in the investigation, evaluation, removal, remediation (including monitoring), treatment or disposal of soil, surfacewater, groundwater or other contamination:

(a)    to the extent required by **Environmental Laws**, or specifically mandated by court order, the government or any political subdivision of the United States of America or any state thereof, Canada or any province thereof, or duly acting under the authority of **Environmental Law(s)**; or the national, regional or local government acting under **Environmental Laws** in any jurisdiction where any **Insured Property** is located.

(b)    which have been actually incurred by the government or any political subdivision of the United States of America or any state thereof or Canada or any province thereof, or by third parties

Copyright, American International Group, Inc., 2000

(2)    With respect to Coverages K and L costs and expenses of investigation and development of remediation strategies and remedial design, specifications, consent orders, decrees, contracts or workplans already developed or which are in development or of the type and nature previously developed, or removal of, or rendering non-hazardous or less hazardous, **Pollution Conditions** to the extent required by **Environmental Laws**, or by governmental or court order or directive, or required or approved by a governmental agency, acting under authority granted by **Environmental Laws;**

(3)    Legal fees and costs expended by or on behalf of the **Insured** in connection with the investigation or removal of, or the rendering non-hazardous or less hazardous of **Pollution Conditions**, provided such fees and costs are reasonable and necessary and are incurred with the written consent of the Company; or

(4)    Costs and expenses of investigation or removal of or rendering non-hazardous or less hazardous, **Pollution Conditions** if such costs and expenses actually have been incurred by the government or any political subdivision of the United States of America, any state thereof, or Canada or any province thereof or by a third party.

F.    **Continuity Date** means the date stated in Item 8 of the Declarations.

G.    **Environmental Laws** means any applicable federal, state, provincial or local laws or applicable regulations pursuant to which the **Insured** has or may have a legal obligation to incur **Clean-Up Costs**.

H.    **Extended Reporting Period** means either the automatic additional period of time or the optional additional period of time, whichever is applicable, in which to report **Claims** following termination of coverage, as described in Section VIII. of this Policy.

I.    **Inception Date** means the beginning date of the period set forth in Item 2 of the Declarations.

J.    **Insured** means the **Named Insured,** and any past or present director, officer, partner , shareholder or employee thereof, including a temporary or leased employee, while acting within the scope of his or her duties as such.

K.    **Insured Contract** means a contract or agreement submitted to and approved by the Company, and listed in a Schedule to this Policy.

L.    **Insured Property** means with respect to Coverages A through J, each of the locations identified in Item 5(a) of the Declarations, and, with respect to Coverages K and L, each of the locations identified in Item 5(b) of the Declarations.

M.    **Loss** means, under the applicable Coverages: (1) monetary awards or settlements of damages for **Bodily Injury** or **Property Damage**; (2) where applicable, costs, charges and expenses incurred in the defense, investigation or adjustment of **Claims** for such damages or for **Clean-Up Costs**; or (3) **Clean-Up Costs.**

Copyright, American International Group, Inc., 2000

N.  **Named Insured** means the person or entity named in Item 1 of the Declarations.

O.  **Non-Owned Location** means a site that is neither owned nor operated by the **Named Insured**, and which is identified in a Non-Owned Covered Locations Schedule attached to and made a part of this Policy by endorsement.

P.  **Personal Property** means any property other than real property and whatever is erected or growing upon or affixed to real property.

Q.  **Policy Period** means the period set forth in Item 2 of the Declarations, or any shorter period arising as a result of cancellation of this Policy

R.  **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis or toxic chemicals, petroleum, chemicals including but not limited to solvents, Hazardous Substances as defined under all applicable federal, state and local **Environmental Laws,** and includes waste.

S.  **Pollution Conditions** means the discharge, dispersal, release or escape of any **Pollutants** into or upon land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment at such levels.

T.  **Property Damage** means:

(1)  Physical injury to or destruction of tangible property of parties other than the **Insured**, including the resulting loss of use or value thereof;

(2)  Loss of use, but not loss of value, of tangible property of parties other than the **Insured**, which has not been physically injured or destroyed; and

(3)  Solely with respect to Coverage **J. FIRST PARTY CLAIMS FOR ON-SITE PROPERTY DAMAGE**, physical injury to or destruction of tangible property, but does not include the resulting loss of use thereof.

**Property Damage** does not include **Clean-Up Costs**.

U.  **Remedial Action Plan** means the:

1)  documentation attached to and forming part of the Policy which describes the **Clean-Up** to be undertaken at the **Insured Property**, and, to the extent described therein, at areas beyond the boundaries of the **Insured Property**; and

2)  the remedial action workplans and investigation and remediation strategies, specifications, consents, orders, decrees, contracts or workplans that are already developed for **Insured Property (ies)** or that will be developed and approved by the

Copyright, American International Group, Inc., 2000

appropriate government agency for the **Insured Property (ies).**

V. **Responsible Insured** means any employee of the **Named Insured** whose primary responsibility is environmental control or compliance, or any plant manager, executive officer, director or Risk Manager or General Counsel, manager of Environmental Affairs, or partner of the **Named Insured**.

W. **Self-Insured Retention** means the amount stated in Item 3 of the Declarations.

X. **Termination Date** means the earliest of the following:

1. The date set forth in Item 2 of the Declarations;

2. The date on which the Limit of Liability shown in Item 3 of the Declarations for Coverages K and L is exhausted; or

3. With respect to Coverage K and L only, when the **Insured** receives written approval from the governmental entity responsible for supervision of the **Clean-Up** that **Clean-Up** has been completed at the **Insured Property** in accordance with the **Remedial Action Plan** in a form substantially similar to a no further action letter at the **Insured Property(ies)** in accordance with the **Remedial Action Plan**. This termination would apply on a site by site basis.

The **Termination Date** shall not by extended by the exercise of any rights held by a governmental entity to reopen, reconsider, or otherwise cause the **Insured** to perform **Clean-Up** after previously having approved or acknowledged that **Clean-Up** has been completed at the **Insured Property** in a form substantially similar to a no further action letter at the **Insured Property** in accordance with the **Remedial Action Plan**. .

Y. **Transportation** means the movement of **Cargo** by a conveyance, from the place where it is accepted by a **Carrier** until it is moved:

(1)    to the place where the carrier finally delivers it; or

(2)    in the case of waste, to a waste disposal facility to which the carrier delivers it.

**Transportation** includes the carrier's loading or unloading of **Cargo** onto or from a conveyance. **Carrier** means a person or entity, other than the **Insured** or any subsidiary or affiliated company of the **Insured**, engaged in the business of transporting property for hire by automobile, rolling stock, vessel or aircraft.

Z.  **Transported Cargo** means **Cargo** after it is moved from the place where it is accepted by the **Carrier** for movement into or onto a conveyance, until the **Cargo** is moved from the conveyance to the place where it is finally delivered to the **Named Insured**. **Transported Cargo** also includes **Cargo** during the loading or unloading onto or from a conveyance, provided that the loading or unloading is performed by or on behalf of the **Named Insured**.

## VII.   CONDITIONS

A.  **Assignment** - This Policy may not be assigned without the prior written consent of the Company, which consent will not be unreasonably withheld. Assignment of interest under this Policy shall not bind the Company until its consent is endorsed thereon.

B.  **Subrogation** - In the event of any payment under this Policy, the Company shall be subrogated to all of the **Insured's** rights of recovery therefor against any person or organization and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights including without limitation, assignment of the **Insured's** rights against any person or organization who caused **Pollution Conditions** on account of which the Company made any payment under this Policy. The **Insured** shall do nothing to prejudice the Company's rights under this paragraph. Any recovery as a result of subrogation procedures arising out of the payment of **Clean-Up Costs** or **Loss** covered under this Policy shall accrue first to the **Insured** to the extent of its deductible and/or any self-insured retention; then to the Company to the extent of its payment under the Policy; and then, to the **Insured** to the extent of any payments in excess of the limit of coverage. Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

C.  **Cooperation** - The **Insured** shall cooperate with the Company and offer all reasonable assistance in the investigation and defense of **Claims** under the applicable Coverages purchased. The Company may require that the **Insured** submit to examination under oath, and attend hearings, depositions and trials. In the course of investigation or defense, the Company may require written statements or the **Insured's** attendance at meetings with the Company. The **Insured** must assist the Company in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses.

D.  **Changes** - Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or stop the Company from asserting any rights under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy.

E.  **Sole Agent** - The **Named Insured** first listed in Item 1 of the Declarations shall act on behalf of all other **Insureds**, if any, for the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation or nonrenewal, and the exercise of the rights provided in the **Extended Reporting Period** clause.

Copyright, American International Group, Inc., 2000

F.   **Voluntary Payments** - No **Insured** shall voluntarily enter into any settlement, or make any payment or assume any obligation unless in response to an emergency or pursuant to state law which requires immediate remediation of **Pollution Conditions**, without the Company's consent which shall not be unreasonably withheld, except at the **Insured's** own cost.

G.   **Concealment or Fraud** - This entire Policy shall be void if, whether before or after **Clean-Up Costs** are incurred or a **Claim** is first made, the **Named Insured** has willfully concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy, the description of the **Insured Property**, or the interest of the **Insured** therein.

H.   **Cancellation** - This Policy may be canceled by the **Named Insured** by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This Policy may be canceled by the Company only for the reasons stated below by mailing to the **Named Insured** at the address shown in the Policy, written notice stating when not less than 60 days (10 days for nonpayment of premium) thereafter such cancellation shall be effective. Proof of mailing of such notice shall be sufficient proof of notice.

   1.   Material misrepresentation by the **Insured**;

   2.   The **Insured's** failure to comply with the terms, conditions or contractual obligations under this Policy in any material respect, and any failure to pay any Deductible when due;

   3.   Failure to pay any premium when due;

   4.   A change in operations at an **Insured Property** during the **Policy Period** which materially increases a risk covered under this Policy, provided, however, that this shall not include the shutdown of a location as long as the location is properly maintained.

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice either by the **Named Insured** or by the Company shall be equivalent to mailing. If the **Named Insured** cancels, the earned premium shall be 100%, effective the date of policy inception. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation. Notice of Nonrenewal shall be issued within 90 days of the expiration of this policy.

I.   **Other Insurance** - Where other insurance may be available for the **Clean-Up Costs** or **Loss** covered under this Policy, the **Insured** shall promptly upon request of the Company provide the Company with copies of all such policies. If other valid and collectible insurance is available to the **Insured** for **Clean-Up Costs** or **Loss** covered by this Policy, the Company's obligations are limited as follows:

Copyright, American International Group, Inc., 2000

1)     This insurance is primary.

2)     The **Named Insured** will assign all rights to other insurance to the Company in the event of a Claim or Loss covered under this policy. If all of the other insurance permits contribution by equal shares, the Company will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, the Company will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

J.     **Right of Access and Inspection** – Subject to any applicable privilege, and without unreasonable disruption of the **Insured's** operations and activities, any of the Company's authorized representatives shall have the right and opportunity but not the obligation when the Company so desires to interview persons employed by the **Insured** and to inspect at any reasonable time, during the **Policy Period** or thereafter, the **Insured Property** and all improvements, structures, products, ways, works, machinery and appliances thereon; but neither the Company nor its representatives shall assume any responsibility or duty to the **Insured** or to any other party, person or entity, by reason of such right or inspection. Neither the Company's right to make inspections, sample and monitor, nor the actual undertaking thereof nor any report thereon shall constitute an undertaking on behalf of the **Insured** or others, to determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practices or are in compliance with any law, rule or regulation. The **Named Insured** agrees to provide appropriate personnel to assist the Company's representatives during any inspection.

K.     **Access to Information** – Subject to any applicable privilege, and without unreasonable disruption of the **Insured's** operations and activities, the **Named Insured** agrees to provide access to the Company to any information developed or discovered by the **Insured** concerning **Clean-Up Costs** for **Pollution Conditions** covered under this Policy, whether or not deemed by the **Insured** to be relevant to such **Clean-Up Costs** and to provide the Company free access to interview any **Insured** and review any documents of the **Insured**.

L.     **Representations** - By acceptance of this Policy, the **Named Insured** agrees that the statements in the Declarations, the Application and the Environmental Reports submitted are their agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the **Insured** and the Company or any of its agents relating to this insurance.

M.     **Action Against Company** - No action shall lie against the Company, except an action for wrongful failure to defend or indemnify an **Insured**, unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy,.

Copyright, American International Group, Inc., 2000

Any person or organization or the legal representative thereof who has secured such judgment against the **Insured,** or written agreement of the **Insured** or the company shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by the Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by the **Insured** or his legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

N.  **Service Of Suit** - It is agreed that in the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the **Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street, New York, New York 10270, or his or her representative, and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

O.  **Financial Assurance** - Coverage I of this Policy shall not be utilized to evidence financial responsibility of any **Insured** under any federal, state, provincial or local law.

P.  **Sale or Transfer of Covered Locations** - Under Coverages K and L, in the event any **Insured Property** is sold, or if ownership or operational control is transferred by the **Named Insured** prior to the completion of the **Clean-Up** to which this Policy applies, this Policy shall remain in full force and effect, subject to its terms and conditions, only if:

1.  The new owner or operator of the **Insured Property** fully complies with all of the terms, conditions, duties and obligations of the **Named Insured** which are set forth in this Policy.

2.  The new owner or operator of the **Insured Property** fully complies with all of the terms, conditions, duties and obligation of **Remedial Action Plan.**

Copyright, American International Group, Inc., 2000

3.    The new owner or operator of the **Insured Property** allows the Company reasonable access to the Insured Property(ies) covered under this policy.

Q.    **Automatic Renewal:**
The first **Named Insured** will have the ability to renew the policy in accordance with the following:

1.    The Limits of Liability will not be for more than original bound policy limits unless agreed upon by the Company at the time of renewal. The renewal limits will not apply to any **Losses** or **Claims** made under the expiring policy.

2.    The **Named Insured** or it successor must inform the company of its intent to renew ninety (90) days prior to the expiration of the Policy.

3.    The option to renew only applies automatically if the "incurred loss ratio" is below 60%. Incurred Loss Ratio means: paid **Losses** plus outstanding loss reserves divided by Premium.

4.    The **Insured** must provide any underwriting information regarding the estimated **Clean-Up Costs, Remedial Action Plans, Insured Properties,** indemnity agreements, and any other information as requested in the renewal application.

5.    The pricing for Coverages A, B, C, D, E, F, G, H, I, and M will not be more then 150% of the policy premium associated with those insuring agreements($683,000)and the pricing for Coverages K and L will not be more then 8% of the remediation costs associated with Coverages K and L.

6.    Premium is 100% earned on the renewal date and is due 10 days from the renewal date.

7.    The Company shall have the right to review and adjust any **Self- Insured Retention** applicable to Coverages K and L.

8.    All coverages must be purchased unless agreed to by the Company in writing prior to the renewal option being exercised.

R.    **Reinstatement of Policy Limits**: A maximum policy aggregate Limit of $100,000,000 may be reinstated during the **Policy Period** for an additional premium of 200% of the entire policy premium. Any remaining limits of liability will be considered exhausted for any **Claims** or **Loss** that occur subsequent to the reinstatement. Such reinstated limits, however, shall be available only for **Clean-up Costs** or **Loss** resulting from **Pollution Conditions** or **Pollutants** different from those which caused the actual or potential impairment of the policy aggregate limit preceding the reinstatement. The additional premium due for the reinstatement is a one time premium charge and will not be prorated.

Copyright, American International Group, Inc., 2000

The additional premium will be due within 10 days of binding the reinstatement. No commission will be paid on the reinstatement.

S..  **Separation of Insureds**: Except with respect to the Limits of Insurance and any rights or duties specifically assigned in this Coverage Part to the first **Named Insured**, this insurance applies:

As if each **Named Insured** were the only **Named Insured**; and

Separately to each insured against whom claim is made or "suit' is brought.

## VIII.  EXTENDED REPORTING PERIOD FOR CLAIMS - COVERAGES A THROUGH I

The **Named Insured** shall be entitled to an Automatic **Extended Reporting Period**, and (with certain exceptions as described in paragraph B. of this Section) be entitled to purchase an Optional **Extended Reporting Period** Endorsement collectively for Coverages A through I, upon termination of coverage as defined in Paragraph B.(3) of this Section. Neither the Automatic nor the Optional **Extended Reporting Period** shall reinstate or increase any of the limits of liability of this Policy.

A.  **Automatic Extended Reporting Period**

Provided that the **Named Insured** has not purchased any other insurance to replace this insurance after the date hereof and which applies to a **Claim** otherwise covered hereunder, the **Named Insured** shall have the right to the following: a period of ninety (90) days following the effective date of such termination of coverage in which to provide written notice to the Company of **Claims** first made and reported within the Automatic **Extended Reporting Period**.

A **Claim** first made and reported within the Automatic **Extended Reporting Period** will be deemed to have been made on the last day of the **Policy Period**, provided that the **Claim** arises from **Pollution Conditions** that commenced before the end of the **Policy Period** and is otherwise covered by this Policy. No part of the Automatic **Extended Reporting Period** shall apply if the **Optional Extended Reporting Period** is purchased.

B.  **Optional Extended Reporting Period**

The **Named Insured** shall be entitled to purchase an Optional **Extended Reporting Period** upon termination of coverage as defined herein (except in the event of nonpayment of premium), as follows:

(1)  A **Claim** first made and reported within the Optional **Extended Reporting Period**, if purchased in accordance with the provisions contained in Paragraph (2) below, will be deemed to have been made on the last day of the **Policy Period**, provided that the **Claim** arises from **Pollution Conditions** that commenced before the end of the **Policy Period** and is otherwise covered by this Policy.

Copyright, American International Group, Inc., 2000

(2)   The Company shall issue an endorsement providing an Optional **Extended Reporting Period** of up to forty (40) months from termination of coverage hereunder for all **Insured Properties** and **Non-Owned Locations**, if applicable, or any specific **Insured Property** or **Non-Owned Location**, provided that the **Named Insured**:

    a.   makes a written request for such endorsement which the Company receives within thirty (30) days after termination of coverage as defined herein; and

    b.   pays the additional premium when due.  If that additional premium is paid when due, the **Extended Reporting Period** may not be canceled, provided that all other terms and conditions of the Policy are met.

(3)   Termination of coverage occurs at the time of cancellation or nonrenewal of this Policy by the **Named Insured** or by the Company, or at the time of the Company's deletion of a location which previously was an **Insured Property** or **Non-Owned Location**.

(4)   The Optional **Extended Reporting Period** is available to the **Named Insured** for not more than 125% of the full Policy premium stated in the Declarations.

**IN WITNESS WHEREOF,** the Company has caused this Policy to be signed by its president and secretary and signed on the Declarations page by a duly authorized representative or countersigned in states where applicable.

_____
**Secretary**

_____
**President**

c:\winword\e&i.pol\slctcap.doc

Copyright, American International Group, Inc., 2000

ENDORSEMENT NO. 1

This endorsement, effective 12:01 AM:   December 22, 1999

Forms a part of policy no.:              PLS/CCC 476 16 84

Issued to:                               Velsicol Chemical Corporation

By:                                      American International Specialty Lines Insurance Company

<u>**SCHEDULE OF INSURED PROPERTIES AND CORRESPONDING SIRS ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed that the following listed locations shall be **Insured Properties** under Item 5(a) of the Declarations:

**Item 5(a): INSURED PROPERTY(IES) – COVERAGES A - J:**

| | |
|---|---|
| Memphis Plant<br>Memphis, TN | Chattanooga Plant<br>Chattanooga, TN |
| Marshall Plant<br>Marshall, IL | Bayport Plant<br>Bayport, TX |
| Chestertown Plant<br>Chestertown, MD | Estonia Plant |

Upon the written request of the **Named Insured**, the above list may be supplemented by the addition of **Insured Property(ies)** that are covered under American International Specialty Lines Insurance Company PLL Policy # 267-53-70 issued to Fruit of the Loom and which pursuant to the terms of the A&I Agreement (as defined in Endorsement 7) are Assumed or Shared Liabilities relating to Velsicol Chemical Corporation ("Velsicol Liabilities") provided any of the following occur:

1)   Fruit of the Loom or William Farley (or any successor or assignee) fail to meet their responsibilities as **First Named Insureds** under the aforesaid Fruit of the Loom Policy; or

2)   The aforesaid Fruit of the Loom Policy is canceled or voided; or

3)   Any first **Named Insured** under the aforesaid Fruit of the Loom Policy (or any successor or affiliate) in any way does not respond with respect to **Clean-Up Costs or Losses**, relating to Velsicol Liabilities that, but for such failure, would have been applied to the Deductible ; or

4)   Fruit of the Loom or any affiliate should disclaim  or reject the A&I Agreement or fail to satisfy its obligations with respect to any Velsicol Liabilities

ENDORSEMENT NO. 1 (cont.)

It is further agreed that the following locations shall be **Insured Properties** under Item 5(b) of the Declarations:

Item 5(b): INSURED PROPERTY(IES) – COVERAGES K - L:

| SITE | VELSICOL GROSS SIRS | FRUIT-OF-THE-LOOM GROSS SIRS | TOTAL GROSS SIR | TOTAL COMBINED COSTS TO 10/23/03 | APPLICABLE SITE SUB SIRS |
|---|---|---|---|---|---|
| Arlington Blending | | $699,390 | $699,390 | $229,898.43 | |
| Bayou Sorrell | | $207,230 | $207,230 | $133,554.94 | $225,000 |
| Bayport | $4,869,675 | $0 | $4,869,675 | $259,692.90 | |
| Beaumont Plant | | $724,170 | $724,170 | $1,463.40 | |
| Bumpass Cove | | $60,820 | $60,820 | $32,906.22 | $100,000 |
| Chattanooga Plant | $4,512,060 | $5,200,950 | $9,713,010 | $3,045,318.62 | |
| ChemDyne | | $0 | $0 | $7,417.75 | $500,000 |
| Cypress Creek | | $1,000,000 | $1,000,000 | $284,908.32 | |
| French Limited | | $9,010 | $9,010 | $526.38 | $250,000 |
| Marble Top | | $977,570 | $977,570 | $260,730.96 | |
| Marshall Plant | $652,725 | $792,870 | $1,445,595 | $403,771.20 | |
| Memphis Plant | $2,978,107 | $6,485,980 | $9,464,087 | $2,876,108.91 | |
| Midco I & II | | $54,060 | $54,060 | $21,148.63 | |
| Pristine, Inc. | | $184,700 | $184,700 | $30,185.17 | $750,000 |
| Seymour | | $0 | $0 | $2,403.64 | $100,000 |
| Shavers Farm | | $5,047,780 | $5,047,780 | $3,561,089.10 | |
| Skinner Landfill | | $1,082,310 | $1,082,310 | $484,988.38 | |
| Smith Farm | | $557,490 | $557,490 | $17,996.69 | |
| Tennessee Products | | $76,580 | $76,580 | $51,118.09 | |
| Total | $13,012,567 | $23,160,910 | $36,173,477 | $11,705,227.73 | |

Upon the written request of the **Named Insured**, the above list may be supplemented by the addition of **Insured Property(ies)** that are covered under American International Specialty Lines Insurance Company PLL Policy # 267-53-70 issued to Fruit of the Loom and which pursuant to the terms of the A&I Agreement (as defined in Endorsement 7) are Assumed or Shared Liabilities relating to Velsicol Chemical Corporation ("Velsicol Liabilities") provided any of the following occur:

    1)    Fruit of the Loom or William Farley (or any successor or assignee) fail to meet their responsibilities as **First Named Insureds** under the aforesaid Fruit of the Loom Policy; or

    2)    The aforesaid Fruit of the Loom Policy is canceled or voided; or

    3)    Any first **Named Insured** under the aforesaid Fruit of the Loom Policy (or any successor or affiliate) in any way does not respond with respect to **Clean-Up**

ENDORSEMENT NO. 1 (cont.)

4)    **Costs** or **Losses**, relating to Velsicol Liabilities that, but for such failure, would have been applied to the **Self Insured Retention; or**

5)    Fruit of the Loom or any affiliate should disclaim or reject the A&I Agreement or fail to satisfy its obligations with respect to any Velsicol Liabilities

Pursuant to Section **V. LIMITS OF COVERAGE DEDUCTIBLE**, paragraph F. **Deductible/Self-Insured Retention** subparagraph **(2) Coverages K and L, a Self-Insured Retention of** $24,468,249 "The Total **Self-Insured Retention**," shall apply to all Clean-Up Costs. This **Self-Insured Retention** represents the sum of all **Self-Insured Retentions** assigned to the above listed **Insured Properties** less the sum of all covered **Clean-Up Costs** paid for **Clean-Up** at those **Insured Properties** as of 10/23/03.

Covered **Clean-Up Costs** incurred at any of the above listed **Insured Properties** shall erode the Total **Self-Insured Retention** and, other than for **Clean-Up Costs** incurred at **Insured Properties** to which a Sub **Self-Insured Retention** applies, this Policy shall not pay covered **Clean-Up Costs** until the Total **Self-Insured Retention** of $24,468,249 has been eroded. In the event additional locations are added as **Insured Properties** under coverages K and L pursuant to the terms of this endorsement, the **Self-Insured Retention** will increase by the **Self-Insured Retention** amount assigned to each additional location less any covered **Clean-Up Costs.**

**Insured Properties** with an assigned Sub **Self-Insured Retention** shall be subject to a separate Sub **Self-Insured Retention.** This Policy shall not pay covered **Clean-Up Costs** until the corresponding Sub **Self-Insured Retention** has been eroded. **Clean-Up Costs** incurred at **Insured Properties** with Sub **Self Insured Retentions** shall erode the Total **Self-Insured Retention.**

The Company agrees that the amounts paid as Approved **Clean-Up Costs** represent the amounts paid for Covered **Clean-Up Costs** as of 10/23/03 at the corresponding **Insured Properties** and the that the Total **Self-Insured Retention** and applicable Sub **Self Insured Retentions** are reduced by the amount of such payments.

With respect to any **Insured Property** acquired pursuant to the terms of this Endorsement, it is further agreed that if the terms and conditions, other than Limits of Liability and Policy Term, applicable to the acquired **Insured Property** would be less restrictive under American International Specialty Lines Insurance Company PLL Policy # 267-53-70 issued to Fruit of the Loom, the terms and conditions of the aforesaid Fruit of the Loom Policy shall apply to coverage applicable to such an **Insured Property.** However, nothing herein shall be deemed or construed to increase the "Policy Aggregate Limit", "Each Incident Limit," "Coverage Section Aggregate Limit," or **Policy Period** shown in the Declarations to this Policy or reduce any Deductible or **Self-Insured Retention.**

Nothing herein shall increase the Limits of liability and all other terms, conditions and exclusions shall remain the same.

_____
**AUTHORIZED REPRESENTATIVE**
or countersignature (in states where applicable)

ENDORSEMENT NO. 2

This endorsement, effective 12:01 AM:   December 22, 1999

Forms a part of policy no.:                      PLS/CCC 476 16 84

Issued to:                                            Velsicol Chemical Corporation

By:                                                    American International Specialty Lines Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

## PRODUCTS LIABILITY ENDORSEMENT

It is here by agreed that the following is added to the Pollution Legal Liability Select Policy for the **Named Insured** as specified on the declarations page in Item 1.  Limits of Liability and Deductibles that pertain to this endorsement are included within this endorsement. Nothing herein shall increase the Policy Aggregate Limit. Coverage afforded under this endorsement is on an OCCURRENCE BASIS and the policy period shown on the declarations page is not applicable to this endorsement. The definition of Occurrence is redefined in this endorsement, refer to the definitions section of this endorsement paragraph NN. All terms and conditions specified in the policy that this endorsement is attached to will apply to this endorsement unless otherwise changed within the endorsement.

Various provisions in this endorsement restrict coverage.   Read the entire endorsement and policy carefully to determine rights, duties and what is and is not covered.

**Defense Cost and Claims Expenses are included within the deductible and limits of liability.**

Throughout this endorsement the words "you" and "your" refer to the **Named Insured**  shown in Item 1. of the Declarations, and any other person or organization qualifying as a **Named Insured**  under this endorsement. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks in this endorsement have special meaning. Refer to DEFINITIONS Section VI.

The following is added to SECTION I—**INSURING AGREEMENTS:**

**COVERAGE M. PRODUCTS LIABILITY**

1.  **Insuring Agreement.**

    a.  We will pay those sums that the **Insured**  becomes legally obligated to pay as damages because of **Bodily Injury** or **Property Damage** included within the **Products Hazard** to which this insurance applies. We will have the right and duty to defend the **Insured** against any "suit" seeking those damages. However, we will have no duty to defend the **Insured** against any "suit" seeking damages for **Bodily Injury** or **Property Damage** to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

       (1) The amount we will pay for damages is limited as described in Section V. LIMITS OF COVERAGE; DEDUCTIBLE and

       (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS as described in this endorsement.

ENDORSEMENT NO. 2 (cont.)

b.  This insurance applies to **Bodily Injury** or **Property Damage** only if:

(1) The **Bodily Injury** or **Property Damage** is caused by an "occurrence" as defined in the Definitions Section of this endorsement that takes place in the "coverage territory."

Damages because of **Bodily Injury** include damages claimed by any person or organization for care, loss of services or death resulting at any time from the **Bodily Injury.**

The following is added to Section **IV. EXCLUSIONS:**

**4. PRODUCTS LIABILITY COVERAGE EXCLUSIONS**

This policy does not apply to :

**A.  Expected or Intended Injury**

**Bodily Injury** or **Property Damage** expected or intended from the standpoint of the insured. This exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect persons or property.

**B.  Liquor Liability**

**Bodily Injury** or **Property Damage** for which any **Insured** may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**C.  Workers Compensation and Similar Laws**

Any obligation of the **Insured** under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**D.  Employer's Liability**

**Bodily Injury** to:

(1) An "employee" of the **Insured** arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph (1) above.

This exclusion applies:

(1) Whether the **Insured** may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **Insured** under an **"Insured  Contract."**

2

ENDORSEMENT NO. 2 (Cont.)

E. War

**Bodily Injury** or **Property Damage** due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

F. Damage to Property

**Property Damage** to:

(1) Property you own, rent or occupy;

(2) Premises you sell, give away or abandon, if the **Property Damage** arises out of any part of those premises;

(3) Property loaned to you; or

(4) Personal property in the care, custody or control of the Insured.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

G. Damage to Your Product

**Property Damage** to "your product" arising out of it or any part of it.

H. Damage to Your Work

**Property Damage** to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

I. Damage to Impaired Property or Property Not Physically Injured

**Property Damage** to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

J. Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

3

ENDORSEMENT NO. 2 (Cont.)

The following is added to Section I **INSURING AGREEMENTS** Subsection 2. **LEGAL EXPENSE AND DEFENSE:**

### SUPPLEMENTARY PAYMENTS FOR COVERAGE M. PRODUCTS LIABILITY

We will pay, with respect to any **Claim** we investigate or settle, or any "suit" against an **Insured** we defend:

1. All expenses we incur.
2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.
3. All reasonable expenses incurred by the **Insured** at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.
4. All costs taxed against the **Insured** in the "suit."
5. Prejudgment interest awarded against the **Insured** on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.
6. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance and apply to the applicable deductible

Our obligation to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

The following subsection C. is added to **SECTION III. RIGHTS OF THE COMPANY AND DUTIES OF THE INSURED IN THE EVENT OF POLLUTION CONDITIONS AND IN CONNECTION WITH REMEDIAL ACTIVITIES:**

### C. PRODUCTS LIABILITY CONDITIONS - COVERAGE M.

1. **Duties In The Event Of Occurrence, Claim Or Suit.**
   a. You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a **Claim**. To the extent possible, notice should include:
      (1) How, when and where the "occurrence" took place;
      (2) The names and addresses of any injured persons and witnesses; and
      (3) The nature and location of any injury or damage arising out of the "occurrence."
   b. If a **Claim** is made or "suit" is brought against any insured, you must:
      (1) Immediately record the specifics of the **Claim** or "suit" and the date received; and
      (2) Notify us as soon as practicable.
   You must see to it that we receive written notice of the **Claim** or "suit" as soon as practicable.
   c. You and any other involved **Insured** must:
      (1) As soon as possible send us copies of any demands, notices, summonses or legal papers received in connection with the **Claim** or "suit";
      (2) Authorize us to obtain records and other information;

4

**ENDORSEMENT NO. 2 (Cont.)**

    (3) Cooperate with us in the investigation or settlement of the Claim or defense against the "suit"; and

    (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

   **d.** No Insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent which will not be unreasonably withheld.

**2. Representations.**

By accepting this policy, you agree:

   **a.** The statements in the Declarations are accurate and complete;

   **b.** Those statements are based upon representations you made to us; and

   **c.** We have issued this policy in reliance upon your representations.

The following definitions are added to **Section VI DEFINITIONS:**

**GG.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

**HH.** "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

   **c.** All parts of the world except: Angola, Cuba, Haiti, Iran, Iraq, Libya, Afghanistan, the Democratic Republic of Sudan, North Korea, or the Federal Republic of Yugoslavia (Serbia and Montenegro) if:

     1) The Insured's responsibility to pay damages is determined in a "suit" on the merits or in a settlement the Company agrees to.

     2) Such Claims must be reported by the Insured to an office of the Company located within the United States or with the prior written consent of the Company, to the Company's local branch or affiliate office.

The Company shall have the right but not the duty to investigate, defend, or settle such Claims. If the Company does not exercise such right, the Insured shall, under the Company's supervision, make such investigation and defense as is reasonably necessary. Subject to prior written authorization of the Company, the Insured may also effect settlement. The Company shall reimburse the Insured for the reasonable costs of such actions, subject to all other provisions of this policy.

This insurance shall not serve as proof of insurance: (i) in any country where non-admitted insurance is prohibited by local applicable law; or (ii) without the prior written consent of the Company.

5

**ENDORSEMENT NO. 2 (Cont.)**

The Company in its sole discretion may issue proof of insurance documents to a third-party upon the request of the **Insured**, but the Company is not obligated to do so.

II. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

JJ. "Impaired property" means tangible property, other than "your product", "your work" or tangible property of others that is contaminated, that cannot be used or is less useful because:

    **a.**    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.**    You have failed to fulfill the terms of a contract or agreement;

        if such property can be restored to use by:

        **1)**    The repair, replacement, adjustment or removal of "your product" or "your work"; or

    **3)**    Your fulfilling the terms of the contract or agreement.

KK. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

LL. "Loading or unloading" means the handling of property:

    **a.**    After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    **b.**    While it is in or on an aircraft, watercraft or "auto"; or

    **c.**    While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

MM. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.**    Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **b.**    Vehicles maintained for use solely on or next to premises you own or rent;

    **c.**    Vehicles that travel on crawler treads;

    **d.**    Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers or drills; or

        **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

    **e.**    Vehicles not described in **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        **(2)** Cherry pickers and similar devices used to raise or lower workers;

ENDORSEMENT NO. 2 (Cont.)

f.   Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

NN.  "Occurrence" means an accident, including  continuous or repeated, exposure to substantially the same general harmful conditions provided, with respects to "your product," the "Occurrence"  or the application of "your  products" must have occurred on or  after December 12, 1986 and before December 22, 2009.

OO.   "Products - completed operations hazard" includes all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of your product or your work except:

1)  Products that are still in your physical possession; or

2)  Work that has not yet been completed or abandoned.  However, your work will be deemed completed at the earliest of the following times:

a)  When all of the work called for in your contract has been completed.

b)  When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

c)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

"Products-complete operations hazard" does not include **bodily injury** or **property damage** arising out of:

1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the **loading or unloading** of that vehicle by any insured;

2)  The existence of tools, uninstalled equipment or abandoned or unused materials; or

7

ENDORSEMENT NO. 2 (Cont.)

3) Products or operations for which the classification listed in the Declarations or in a policy schedule, states that products - completed operations are subject to the General Aggregate Limit.

**PP.** "products hazard":

    **a.** Includes all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of "your product" except, Products that are still in your physical possession; and

    **b.** Does not include **Bodily Injury** or **Property Damage** arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Occurrences prior to the date December 12, 1986; or

    (4) Dioxins unless products which are also considered in the Dioxin category are specifically scheduled onto the policy

**QQ.** "Suit" means a civil proceeding in which damages because of **Bodily Injury** or **Property Damage** to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the **Insured** must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with our consent.

**RR.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**SS.** "Your product" means:

    **a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed after December 12, 1986 by:

    (1) You;

    (2) Others trading under your name; or

    (3) A person or organization whose business or assets you have acquired; and

    **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products; and

    **c.** All products as identified in the Scheduled Products endorsement.

"Your product" includes:

    **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **b.** The providing of or failure to provide warnings or instructions.

    "Your product" does not include vending machines or other property rented to or located for the use of others but not sold. and goods or products containing Dioxins unless specifically scheduled onto the policy.

8

**ENDORSEMENT NO. 2 (Cont.)**

It is hereby agreed that the following **Policy Period** applies to Coverage M only:

Policy Period: December 12, 1986 to December 22, 2009.

The following is added to Section **V., LIMITS OF COVERAGE; DEDUCTIBLE,** as paragraph **G., Products Liability Limit of Coverage and Deductible:**

Coverage provided by this Endorsement shall be subject to the Policy Aggregate Limit stated in item 4. of the declarations. Subject to the Policy Aggregate Limit, the most the company will pay for any single "occurrence" is $50,000,000.

A deductible of $500,000 each and every Claimant shall apply to coverage provided by this Endorsement. If an "occurrence' arises in which multiple claimants and/or multiple suits arise as a result of the same application of the product(s) by the same applicator(s) of pesticides or herbicides, at the same location, at the same time, the deductible will apply to each Claimant but will be aggregated at $1,000,000 with a $5,000 maintenance deductible for each additional claimant after the aggregated deductible of $1,000,000 is exceeded.

The following is added to Section **V., LIMITS OF COVERAGE; DEDUCTIBLE,** as paragraph **H, Products Liability Limit Anti-Stacking of Limits :**

In the event any **Claim(s)** covered under this Coverage M. of this Policy is also covered by American International Specialty Lines Insurance Company, Pollution Legal Liability Clean-Up Cost Cap Policy # PLS 267-53-70 issued to Fruit of the Loom, the Company's total liability for such a **Claim** shall not exceed $50,000,000. Amounts paid for such a **Claim(s)** under PLS 267-53-70 shall reduce the available per Occurrence Limit of Liability under this Policy, however, any payment made under PLS 267-53-70 shall not erode the Policy Aggregate under this Policy.

All other terms, conditions and exclusions remain the same.

AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

9

**ENDORSEMENT NO. 3**

**This endorsement, effective 12:01 AM:** December 22, 1999

**Forms a part of Policy no.:**            PLS/CCC  476 16 84

**Issued to:**                           Velsicol Chemical Corporation

**By:**                                  American International Specialty Lines Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed the following are considered **Insured Properties** under item 5(a) of the Declarations for Coverages A, C,D,E, and F. All **Clean-Up Cost** or **Loss**  arising from the following scheduled **Insured Properties** shall be subject to a corresponding "Sub-Aggregate Deductible." Subject to Section V., LIMITS OF COVERAGE :DEDUCTIBLE, paragraphs A through F, this Policy shall not   pay **Clean-Up Costs** or **Loss** arising from an **Insured Property** scheduled below until such **Clean-Up Costs** or **Loss**  exceeds the corresponding "Sub-Aggregate  Deductible."

<u>**Insured Properties and Corresponding "Sub- Aggregate Deductibles"**</u>

| Insured Properties | Sub Aggregate Deductible |
|---|---|
| Tennessee Products Chattanooga, TN | $500,000 |
| Walker Misc. Mathis Mathis Farm Site Walker Co., GA | $500,000 |
| Walker Misc. Chickamauga LF Site Walker Co., GA | $500,000 |
| Bayou Sorrel Bayou Sorrel, LA | $250,000 |
| Pristine Reading, OH | $500,000 |
| Walker Misc. Shavers II Walker Co., GA | $500,000 |
| Walker Misc. Watson Farm Walker Co., GA | $100,000 |
| Walker Misc. David Jones Walker Co., GA | $500,000 |

ENDORSEMENT NO. 3 (Cont.)

| | |
|---|---|
| Walker Misc. Word Farm Walker Co., GA | $100,000 |
| Motco Lamarque TX | $250,000 |
| French Limited Site Crosby, TX | $250,000 |
| American Chemical Services Griffith, IN | $75,000 |
| MIDCO I & MIDCO II Gary, IN | $250,000 |
| Fike/Artel Site Nitro, WV | $75,000 |
| Liquid Disposal Inc. Utica, MI | $75,000 |
| Rogers Rental & LF Centerville, MS | $500,000 |
| Sheridan Site Hempstead, TX | $50,000 |
| Sonics International Ranger, TX | $75,000 |
| Vertac Jacksonville, AK | $100,000 |
| Marzone Superfund Site Tifton, GA | $500,000 |
| Mobile Tank Car Services Louisville, KY | $75,000 |
| Hartley & Hartley Kawkawlin, MI | $250,000 |
| Distler Brickyard/Farm Louisville, KY | $50,000 |
| Steve Martell Sites | $500,000 |
| Arlington Blending & Packaging Site Arlington, TN | $500,000 |
| Mathis Landfill-Shaver's Farm Walker County, GA | $500,000 |
| Smith Farm St. Louis, MI | $500,000 |

ENDORSEMENT NO. 3 (Cont.)

| | |
|---|---|
| Bumpass Cove Landfill Embreville, TN | $500,000 |
| Mobile Tank Car Services Cleveland, OH | $75,000 |
| Central Chemicals Hagerstown, MD | $500,000 |
| Woolfolk Chemical Works Site Fort Valley, GA | $500,000 |
| Carolina Chemical West Columbia, SC | $500,000 |
| Farmland Industries St. Joseph, MO | $75,000 |
| Lowman Mill Site Lowman, ID | $75,000 |
| Marshall Off-Site Tributary Marshall, IL | $500,000 |
| Hassayampa LF Maricopia Co., AZ | $50,000 |
| Seymour Recycling Seymour, IN | $50,000 |
| Parr-Richmond Richmond, CA | $75,000 |
| Saginaw River Saginaw, MI | $75,000 |
| Nease Chemical Salem, OH | $500,000 |
| Skinner Landfill West Chester, OH | $500,000 |
| Cypress Creek Memphis, TN | $500,000 |
| Galena Park Galena Park, TX | $500,000 |
| Mathis Landfill-Marble Top Road Site Walker Co., GA | $500,000 |
| Beaumont Plant Beaumont, TX | $75,000 |
| Valley Chemical Greenville, MS | $500,000 |
| Chem-Dyne Hamilton, OH | $500,000 |

ENDORSEMENT NO. 3 (Cont.)

| | |
|---|---|
| Alburn Chicago, IL | $50,000 |
| Aidex Site Council Bluffs, IA | $75,000 |

It is further agreed and understood that the **Continuity Date** for the **Insured Properties** listed in this Endorsement will be the date that the **Named Insured** acquired the **Insured Property**.

All other terms, conditions and exclusions remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (in states where applicable)

**ENDORSEMENT NO. 4**

**This endorsement, effective 12:01 AM:**  December 22, 1999

**Forms a part of policy no.:**  PLS/CCC 476 16 84

**Issued to:**  Velsicol Chemical Corporation

**By:**  American International Specialty Lines Insurance Company

**NAMED INSURED ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed that Velsicol Chemical Corporation is the first **Named Insured** and will be responsible for payment of premium and deductible or Self Insured Retention, and notification to other **Named Insureds**.

All other terms, conditions and exclusions shall remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (where required by law)

ENDORSEMENT NO. 5

**This endorsement, effective 12:01 AM:** December 22, 1999

**Forms a part of policy no.:**      PLS/CCC 476 16 84

**Issued to:**                Velsicol Chemical Corporation

**By:**                  American International Specialty Lines Insurance Company

### ADDITIONAL NAMED INSURED ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed that the following entity is added as an additional **Named Insured:**

True Specialty Corporation

All other terms, conditions and exclusions shall remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (where required by law)

Endorsement  6

This endorsement, effective 12:01 AM:  December 22, 1999

Forms a part of Policy no.:  PLS/CCC 476 16 84

Issued to:  Velsicol Chemical Corporation

By:  American International Specialty Lines Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

It is hereby agreed that the following locations divested by Fruit of the Loom to the **Named Insured** are considered **Insured Properties** under Item 5(a) of the Declarations for Coverages A,C,D,F, and I.

**Fruit of the Loom Divested Properties**

| FOL Company / Major Production (if appropriate) Loom Facilities / Northwest Industries | Year Acquired by Fruit of the Loom | Year Divested by Fruit of the |
|---|---|---|
| **Velsicol Chemical** VCC Agrichemicals, Inc.     Bayport, TX Sandoz in 1986.     Beaumont, TX VCC sold to management     Chattanooga, TN stock sale.     El Dorado, AR     Glendale, AZ     Marshall, IL     Memphis, TN     San Louis Potosi, Mexico | 1965 | 1985-86 - sold assets to Reminder of team in 1986 |
| **Hawkeye Chemical** Velsicol Chemical     Clinton, IA | Velsicol Chemical | See above |
| **Michigan Chemical** Velsicol Chemical     Manistee, MI     Port St. Joe, FL     Napoleon, OH | Merged into VCC in 1975-76 | See above |
| **Terra Chemical** Chemical     Sioux City, IA | 1967 | See above Velsicol |

**Endorsement No. 6 (Cont.)**

It is further agreed that the **Continuity Date** for the **Insured Properties** listed in this endorsement will be the date that the **Named Insured** acquired the **Insured Properties**.

It is further agreed that the following will apply to the **Insured Properties** listed in this endorsement.

## AGGREGATE DEDUCTIBLE WORDING

It is hereby agreed that solely with respect to **Loss** arising the above listed **Insured Properties**, Item 3, Deductible, of the Declarations Page, is deleted in its entirety and replaced by the following:

| | | |
|---|---|---|
| $ | 500,000 | Each Claim |
| $5,000,000 | | Aggregate |
| $ | 10,000 | Each/Every (Drop Down) |

Furthermore, the Company's obligation under the coverage provided by this policy to pay **Loss** or **Claim Expense** or both on behalf of the **Insured**, applies only to the payment of **Loss** or **Claim Expense** in excess of the applicable Deductible Amount shown in Item 3 of the Declarations, and subject to the Limits of Liability stated in Item 3 of the Declarations. The "Each Claim" deductible amount shown above is the deductible amount applicable to each **Claim**. Once the **Named Insured** pays deductible amounts which in the aggregate equal or exceed the amount shown above as the "Aggregate", the "Each/Every (Drop Down)" deductible shown above shall apply thereafter to each **Claim**. However, in no event shall the deductible amount applicable to any **Claim** covered by this policy be less than the "Each/Every (Drop Down)" deductible amount shown above.

All other terms, conditions and exclusions remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (in states where applicable)

**ENDORSEMENT NO. 7**

**This endorsement, effective 12:01 AM:** December 22, 1999

**Forms a part of policy no.:** PLS/CCC 476 16 84

**Issued to:** Velsicol Chemical Corporation

**By:** American International Specialty Lines Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

<u>SCHEDULE OF INSURED CONTRACTS</u>

It is hereby agreed that the following are scheduled as **Insured Contracts** to this Policy:

<u>INSURED CONTRACTS</u>

Indemnity and Sale agreement between Velsicol Chemical Corporation and Fruit of the Loom dated December 12, 1986.

All other terms, conditions and exclusions shall remain the same.

<u>AUTHORIZED REPRESENTATIVE</u>
or countersignature (where required by law)

ENDORSEMENT NO. 8

This endorsement, effective 12:01 AM:     December 22, 1999

Forms a part of policy no.:     PLS/CCC 476 16 84

Issued to:     Velsicol Chemical Corporation

By:     American International Specialty Lines Insurance Company

## JOINT DEFENSE ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed that, subject to all of the terms and conditions of the Policy, the Company has the right and obligation to defend any **Claim** covered by this Policy made against any **Insured**.  All such **Claims** shall be defended on a "joint defense" basis, subject to applicable law, under which:

    (a)  the Company shall appoint one counsel to defend all of the **Insureds** who are or may be involved with respect to any such **Claim**; and

    (b)  all of the **Insureds** shall have the obligation to cooperate with respect to the investigation and joint defense of any such **Claims.**

All other terms, conditions and exclusions shall remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (where required by law)

ENDORSEMENT NO. 9

**This endorsement, effective 12:01 AM:** December 22, 1999

**Forms a part of policy no.:** PLS/CCC 476 16 84

**Issued to:** Velsicol Chemical Corporation

**By:** American International Specialty Lines Insurance Company

**SERVICE OF SUIT - ILLINOIS**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed that Section **VII. CONDITIONS**, paragraph N. **Service of Suit** is deleted in its entirety and replaced with the following:

It is agreed that in the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the **Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street, New York, New York, or his or her representative, and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance, other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates President, Midwestern Risk Specialists, Inc., 500 West Madison, Chicago, Illinois 60661, or the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms, conditions and exclusions shall remain the same.

AUTHORIZED REPRESENTATIVE
or countersignature (where required by law)

**ENDORSEMENT NO. 10**

**This endorsement, effective 12:01 AM:** December 22, 1999

**Forms a part of Policy No:**          PLS/CCC 476 16 84

**Issued to:**                          Velsicol Chemical Corporation

**By:**                                 American International Specialty Lines Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

It is hereby agreed and understood that only the following products are considered "your products" as defined in Endorsement #2.

**Schedule of "your products"**

1.2 Dichloroethylacetate
10-45 Special Ester
10-88 Special Ester
2 Ethyl Hexyl Benzoate
2, 4, 5, Trichlorotoluene
3a, 4, 5, 6, 7, 7a Hexahydro-4, 7-Methano-idenal
3-Chloromethyl Benzoate
Accutrol
Admex 334F
Admex 409
Admex 412
Admex 429
Admex 523
Admex 760
Admex 770
Admex 775
Admex 1440
Admex 1663
Admex 1723
Admex 6187
Admex 6985
Admex 6994
Admex 6995
Admex 6996
Admex 910-001
Admex P-1
Admex P-27
Aldrin
Allethrins (Esoio, Bio, o-els)
Allumium Phosphide
Amdro
Ammonium Bromide Solution
Aqueous Sodium Tribromophenate
Banvel/Banvel II (dicamba)
Barban 240E
Barricade

**ENDORSEMENT NO. 10 (Cont.)**

BDCP (Bromodichloropropane)
BEI
Belt 336 Granular
Belt 72 ECF
Belt MP
Benthiocarb
Benzaldehyde
Benzodye 610
Benzodye 800
Benzodye Dodecyl Benzoate
Benzoflex 50
Benzoflex 126
Benzoflex 131
Benzoflex 155
Benzoflex 200
Benzoflex 2-45
Benzoflex 248
Benzoflex 284
Benzoflex 296
Benzoflex 319
Benzoflex 352
Benzoflex 354
Benzoflex 400
Benzoflex 404
Benzoflex 9-88
Benzoflex 1046
Benzoflex 2088
Benzoflex 2160
Benzoflex 2870
Benzoflex 2888
Benzoflex 6000
Benzoflex H-100
Benzoflex P-600
Benzoflex PLV
Benzoflex S-312
Benzoflex S-404
Benzoflex S-432
Benzoflex S-552
Benzoflex T-150 (S-358)
Benzoguanamine
Benzoic acid
Benzoitrie
Benzophenone
Benzotrichloride
Benzoyl Chloride
Benzyl Alcohol
Benzyl Benzoate
Benzyl Chloride
Big Daddy 221 EC
Big Daddy 330 EC
Big Daddy 333 EC

ENDORSEMENT NO. 10 (Cont.)

Boric Acid
Brisk Biocide
Brisk Germicide
Brodifacoum (Talon)
Bromoacetic Acid
Bromodlehlorobenzene
BTCM (Bromotrichloromethane)
Butanol dibenzoate
Butyl Benzoate
Butyl Bromide
CADMA
Calcium Chloride Granular
Carbyne
Carbyne 2EC
Chlordane
Chlordane Epoxide
Chlorandic Acid
Chlorandic Anhydride
Chlorendic Dol
Chlorendic Resins
Chlorhepton
Chlorinated Toluene
Chlorohepton 2
Chlorhepton 5
Chlorophacinone
Chloropicrin
Chlorotoluenes
Chlorpyrifos
CN 10-5244
CP Trimer
Cupric based fungicides
cyfluthrin
Cyhalthrin
Cylopentadiene reaction products w/Sodium Hypochlotite
Cypermathrin
DCPD Alcohol
DDT
Deactivator
DEC (Diethanolaminoathyl Chloride Hydrochloride)
Di-chlordane EC
Dichlorvos
Dicyclo Bottoms, Resin Oil
Dicyclopantadiene
Dicyclopentadiene Dioxide
Diethylene Glycol Dibenzoate
Dihydroheptachlor
Dioxins
Diphacin 110
Diphacin 110 S
Diphacin 1105
Diphacin 110A

ENDORSEMENT NO. 10 (Cont.)

Diphacin 120
Diphacinone, Tech
Dipropylene Glycol Dibenzoate
Dipropylene Glycol Monomethyl Ether Benzoate
Disugran
Dithiocarbarriates
DMC (Dimethylaminoethylchloride Hydrochloride)
DMIC (Dimethylaminoisopropylchloride Hydrochloride)
DMON
DMPC (Dimethylaminopropylchloride Hydrochloride)
Dulak I
Dulak II
Emml EC
Endosulfan
Endrin
Endrin-Methyl Parathion
Endrin-Methyl Parathion EC
En-Sure 50% WP
En-Sure EC
EPN
Ethylbromide
Ethylene Dichloride
Fenitrothion
Fenoxycarb
Fenvalerate
Ficam W
Firemaster 100
Firemaster 680
Firemaster 935
Firemaster BP 4 A
Firemaster PHT 4
Fluorolipids
Fumigant EDB-85
Gold Crest 2, 4-Diamine
Gold Crest Biomethalin Bait 100
Gold Crest C
Gold Crest H
Gold Crest Kepone
Gold Crest Promar
Gold Crest Rodenticide PE-1
Gold Crest Tribute
Gold Crest Vectrin
Gold Crest Vangeance
HCS 3510
HCS-3260
Heptachlor
HEX
Hexachlorphene
Hexachlorocyclopentadiene
Hydrobromic Acid
Ingredient 2

ENDORSEMENT NO. 10 (Cont.)

Insectape
Isocyanate Dimer
Isodrin
ISO-Fenphos
Isononyl Benzoate
JH-286
Jolt 156
Kayazinon
Killmaster I, II
Klyrvel 30
Klyrvel 60
Klyrvel 75
Klyrvel 90
KT-30
Leptophos
Lindane
MAADMA-Methylaminoacealdahyde Dimethylacetal
Marksman
Memmi .8 EC-AG
Memmi .8 EC Fungrade
Merphos
Methazole
Methendic Anlydride
Methyl Bromide
Methyl Bromide 100
Methyl Bromide 982
Methyl Bromide 995
Methyl Bromide w/Chloroplcrin
Methyl Parathion
Methylnorbornene
Methylure Bromide
Mirex
Monomethylamine
MTD
Muriatic Acid
Ne Master
n-Hexyl Bromide
Orthoklor 10
Orthoklor 44
Orthoklor 72
Parathion
Parathion 4E
Parathion 6E
Parathion 8E
Parathion, Tech
Parathion-Methylparathion 6-3
Parhep
Paradichlorobenzene
Partron M 4 EC
Partron MUEC
PBB (polybrominated biphenyl)

ENDORSEMENT NO. 10 (Cont.)

PCB
PCL-1
PCL-2
PCL's (Hex Intermediates)
PCNB 100
PCNB 40 DB
PCNB 75 WP
PCNB 80 DE
PCNB Landplaster Mix
Pentachlorphenol
Permethrin
Pest Aid 180
Pestmaster EDB 85
Pestmaster Fumigant 1
Pestmaster Fumigant 1.5
Pestmaster Methyl Bromide Fumigant (481-41-876)
Pestmaster Methyl Bromide Fumigant (876-267)
Pestmaster Methyl Bromide Fumigant w/(1%) Chloropicrin (481-78)
Pestmaster Methyl Bromide Fumigant w/ Chloropicrin (876-258)
Pestmaster Methyl Bromide Fumigant w/ (2%) Chloropicrin  (481-74-874)
Pestmaster Sixteen
Pestmaster Thirty Three
PETB (Pantaorythritol Tarabenzoate)
PETB Special Grade
Petroleum Distillates
Phosvel
Phoxim
Pivacin
Pivacin Concentrate
Pivaloyl Chloride
Polyisobutylene
Polyvel G-100; XL-30
Polyvel G-104; XL-30
Polyvel G-1047
Polyvel G-106
Polyvel G-1070
Polyvel G-110; XL 37
Polyvel G-115
Polyvel G-120
Polyvel G-1270
Polyvel G-130
Polyvel G-85; XL-30
Polyvel GP-4477
Polyvel GP-45
Polyvel GP-65
Polyvel M-100 AD-21
Polyvel M-101 AD-4
Polyvel M-102
Polyvel M-1070
Polyvel M-120
Polyvel M-130; AD6-3HCP

ENDORSEMENT NO. 10 (Cont.)

Polyvel M-20 Resin
Polyvel M-2065
Polyvel M-2071
Polyvel M-80
Polyvel M-8070
Polyvel M-2050
Polyvel S-2055
Polyvel S-2080 (M-144A)
Positive Control
Potassium Benzoate
Potassium Bromide
Probe
Prodiamine
Propoxur
Propylene Oxide
Pydrin
Pyrethrins
QM 55 NI
R acuza Tech
R-1A Bototros
Ramik
Ravage
Rizolex
Roost No-More
Rotac
Salrotin
Sesame
Smoke Flavor 125
Sodium Benzoate
Sodium Bromide
Sodium Bromodichlorophenol
Sodium Diphacione Tech
Sodium Fluoracetate (compound 1080)
Soil Fumigant 33
Soil Fumigant 67
Soil Fumigant 70
Solvent 30
Spear
Stikvel P-70 Resin
Stikvel P-701
Stikvel P-7515
Stikvel W
Stikvel W-701
Strychnine
Subterm #2
Sucrose Benzoate
Sulphur based fungicides
Synetrol
Synthetic Pyrethroids
Tabaquin
Ten-Creo

### ENDORSEMENT NO. 10 (Cont.)

Termide
Termide Fervalerate
Texanol Benzoate
Tiovel 2 EC
TMBC (Bromochloropropane Trimethylenechlorobromide)
Tribromoethane
Tribromopentyl Alcohol
Tribromophenol
Tiovel 3 EC
Tripropylene Glycol Monomethylether Benzoate
Tris-PB
VCC 48
VCC 795
VCC 935 A
VCC 984
VCS 515
Vectrin
Vel 112941
Vel 112942
Vel 112943
Vel 4283
VEL 5026 (Buthidazole)
Vel 5026 75 WD6
VEL Cycileamine
Velate 234
Velate 262
Velate 300
Velate 310
Velate 368
Vengeance
Vitamine D3
VPL DCP
Warfarin
Warfarin Plus
Weedmaster
XA-100 (wick & aerosol)
Xylene
Zinc Bromide Solution

All other terms, conditions and exclusions remain the same.

AUTHORIZED REPRESENTATIVE
or countersignature (where required by law)

ENDORSEMENT NO. 11

**This endorsement, effective 12:01 AM:**    December 22, 1999

**Forms a part of Policy No.:**    PLS/CCC 476 16 84

**Issued to:**    Velsicol Chemical Corporation

**By:**    American International Specialty Lines Insurance Company

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

It is hereby agreed that the following Non-Owned Disposal Sites are considered **Non-Owned Locations** under Coverages G and H.

<u>**Non-Owned Locations**</u>

| | |
|---|---|
| Saunders Leasing | Memphis, TN |
| Vertut Blending | Memphis, TN |
| Anderson Development | Adrian, MI |
| Woodbury | Commerce City, CO |
| Woodbury | Homestead, FL |
| Woodbury | Orlando, FL |
| Plastifax | Gulfport, MS |
| Drake Chemical | Lock Haven, PA |
| Waste, Inc. | Michigan City, IN |
| Nease Chemical | Salem, OH |
| U.S. Ecology | Sheffield, IL |
| U.S. Ecology | Robstown, TX |
| Distler Brick Yard | West Point, KY |
| Sheridan Disposal | Hempstead, TX |
| Parr/Heckathorn | Richmond, CA |
| Taylor Borough Dump | Taylor Borough, PA |
| Rollins | Baton Rouge, LA |
| Rogers Landfill | Centreville, MS |

### ENDORSEMENT NO. 11(Cont.)

| | |
|---|---|
| Ann Arbor Labs | Ann Arbor, MI |
| VICCA | Chicago, IL |
| ChemWaste Service | Emelle, AL |
| ChemWaste Mgt. | Port Arthur, TX |
| U.S. Ecology | Beatty, NV (Low-Level RAD) |
| Clegg | Durham, NC |
| Gulf Coast Waste Disposal Authority | Bayport, TX |
| SCA | Model City, NY |
| G.E., Inc. | Pittsfield, ME |

| Project Name | Project Location |
|---|---|
| Summit National | Peerfield, OH |
| Economy Products | Omaha, NE |
| Rockland Chemical | West Caldwell, NJ |
| Metamora Landfill | Michigan |
| Chattanooga Coke | Chattanooga, TN |
| Chattanooga Boneyard | Chattanooga, TN |
| South 8th Street Landfill | West Memphis, AR |
| Hartley Landfill | Michigan |

It is further agreed that if any site listed above is, or can be, also listed for coverage under as an **Insured Property** under this Policy, only the coverage as an **Insured Property** will apply and the location will be automatically considered deleted from this endorsement. Also, if any **Non-Owned Locations** listed in this endorsement was ever owned or operated by Velsicol Chemical Corporation or any preceding company, the **Non-Owned Locations** will be considered automatically deleted from this endorsement.

**Non-Owned Location** also includes:

1) Any unintentionally omitted location owned or operated by entities other then the **Named Insured** or any of its current or formerly owned subsidiaries, and utilized by the **Named Insured** solely for the disposal of waste prior to the Continuity Date specified in Item 8 of the Declarations Page.

2) Any locations used by **Non-Owned Locations** scheduled in this endorsement or covered under Paragraph 1) above that were utilized for the treatment and disposal of the **Named Insureds** waste.

**ENDORSEMENT NO. 11(Cont.)**

3)    Additionally, **Non-Owned Locations** include the following provided they a were not intentionally omitted from Fruit of the Loom, Inc. American International Specialty Lines Insurance Company PLS 267 53 70 and owned or operated by entities other than the **Named Insured** or any of its current or formerly owned subsidiaries, and utilized by the **Named Insured** solely for the disposal of waste prior to the Continuity Date specified in Item 8 of the Declarations Page.

**Non- Owned Locations** omitted from Fruit of the Loom Policy:

Bellevue Avenue Dump
Bumpass Cove/Fowler
Chattanooga Creek
Chem Waste Disposal Co. (TX)
Creotox
Crumbaugh Disposal Well
Diamond Shamrock (GA)
Galloway Pits
Gurly Related Site (Arkansas)
Hamill Rd Dump #1
Hamill Rd Dump #2
Hamill Rd Dump #3
Hexagon Labs
Jackson Pit Dump
Marshall Road Dump
Morgan Material/Chemical
Norfolk Southern (aka Atlas Chemical)
Red Panther
Ross Brothers (Grafton, OH)
Sarnia-Toronto, Canada
St. Louis Golf Course
St. Louis Gratiot

All other terms, conditions and exclusions shall remain the same.

**AUTHORIZED REPRESENTATIVE**
or countersignature (in states where applicable)

# EXHIBIT 2

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
07/10/2007
Log Number 512386018

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

**TO:**    Elizabeth Karkula, Senior Corporate Counsel
Velsicol Chemical Corporation
10400 W. Higgins Road
Rosemont, IL, 60018-

**RE:**    **Process Served in Michigan**

**FOR:**    VELSICOL CHEMICAL CORPORATION (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | City of St. Louis, Michigan, Pltf. vs. Velsicol Chemical Corporation, et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Amended Summons, First Amended Complaint and Jury Demand, Complaint and Jury Demand |
| **COURT/AGENCY:** | 29th Circuit Court, Gratiot County, MI<br>Case # 0710385CE |
| **NATURE OF ACTION:** | Environmental Litigation - Property Damage - Water contamination due to the release of certain chemical known as P-CBSA resulting in damages to Pltfs. wells and drinking water supplies - Seeking damages and injunctive relief |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Bingham Farms, MI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/10/2007 at 11:05 |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after receipt of Summons |
| **ATTORNEY(S) / SENDER(S):** | David K. Otis<br>Plunkett Cooney<br>325 E. Grand River<br>Suite 250<br>East Lansing, MI, 48823<br>517-324-5612 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day, 798214988974 |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | The Corporation Company<br>Stephanie Hendrickson<br>30600 Telegraph Road<br>Suite 2345<br>Bingham Farms, MI, 48025-5720 |
| **TELEPHONE:** | 248-646-9033 |

Page 1 of  1 / TB

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.

To order this form, call (517) 337-1211
Target Information Management, Inc.
Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | Amended | CASE NO. |
|---|---|---|
| JUDICIAL DISTRICT | SUMMONS AND COMPLAINT | 07-10385-CE |
| GRATIOT JUDICIAL CIRCUIT | | |
| COUNTY PROBATE | JUDGE RANDY TAHVONEN | |

Court address

Gratiot County Courthouse, 214 East Center St Ithaca MI 48847  (517)875-522

Court telephone no.

Plaintiff name(s), address(es), and telephone no(s).

CITY OF ST. LOUIS, MICHIGAN

v

Defendant name(s), address(es), and telephone no(s).

VELSICOL CHEMICAL CORPORATION
CT Corporation System
30600 Telegraph Rd
Bingham Farms MI 48025

Plaintiff attorney, bar no., address, and telephone no.

Local Counsel:
David K Otis (P31627)
PLUNKETT COONEY
325 E Grand River Ste 250
East Lansing MI 48823
(517) 324-5612

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| 4-11-2007 | 9-11-2007 | Carol A. Vernon |

*This summons is invalid unless served on or before its expiration date.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint/
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| St. Louis, MI | Bingham Farms, MI |

Place where action arose or business conducted

City of St. Louis, Gratiot County, MI

| Date | Signature of attorney/plaintiff |
|---|---|
| 7-05-07 | P31627 |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you to fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/02)  **SUMMONS AND COMPLAINT**   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

DEFENDANT

TRUE COPY

JUL - 9 2007

Carol A. Vernon
Gratiot Co. Clerk

## STATE OF MICHIGAN

### IN THE 29th JUDICIAL CIRCUIT IN AND FOR THE COUNTY OF GRATIOT

CITY OF ST. LOUIS, MICHIGAN,

                 Plaintiff,

-vs-

VELSICOL CHEMICAL CORPORATION,
NWI-1, INC. (F/K/A FRUIT OF THE LOOM, INC.),
LePETOMANE II, Inc. as Trustee of the Fruit of the
Loom Successor Liquidation Trust, LePETOMANE III, Inc.
as Trustee of the Fruit of the Loom Custodial Trust,
EDGEWOOD FARMS, INC., and DOES 1-300,

                 Defendants.

Case No:  07-  10385 CE

**FIRST AMENDED
COMPLAINT FOR DAMAGES
AND OTHER RELIEF**

**JURY TRIAL DEMANDED**

_____/

Victor M Sher, CA SBN 96197, *pro hac vice pending*
Richard M Franco, CA SBN 170970, *pro hac vice pending*
Todd E Robins, CA SBN 191853, *pro hac vice pending*
Andrea S Issod, CA SBN 230920, *pro hac vice pending*
SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 348-8300
Facsimile: (415) 348-8333

Kevin Madonna, NY SBN 2981181, *pro hac vice pending*
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514

David Otis, #P31627
PLUNKETT & COONEY PC
325 E Grand River Ave Ste 250
East Lansing, MI 48823
Telephone: (517) 324-5612
Facsimile (517) 333-6694

## COMPLAINT

There is no other pending or resolved civil action
arising out of the transaction or occurrence alleged
in the complaint.

PLAINTIFF CITY OF ST. LOUIS, by and through their attorneys, hereby alleges as

follows, based on information and belief and investigation of counsel:

1

## COMMON ALLEGATIONS

### I. SUMMARY OF THE CASE

1. Plaintiff CITY OF ST. LOUIS ("Plaintiff") owns and operates a public drinking water system that provides drinking water to residents and businesses in and around St. Louis, Michigan. Plaintiff seeks to recover by this action the substantial costs necessary to protect the public and restore and/or replace its damaged drinking water supply wells, which are contaminated by the hazardous chemical, para-Chlorobenzene Sulfonic Acid (p-CBSA) and threatened with imminent contamination by other harmful chemicals.

2. P-CBSA is a by-product of the manufacture of dichlorodiphenyltrichloroethane (DDT), a dangerous pesticide used extensively before it was banned for all practical purposes in the 1970s. In comparison to other DDT-related by-products and wastes, p-CBSA is highly mobile and soluble and known to be a precursor to detection of other harmful chemicals from the same source.

3. There are several sites in and around St. Louis in the vicinity of Plaintiff's wells where p-CBSA and other harmful chemicals were injected, buried, discharged, disposed of and/or otherwise released into the environment, and from where such chemicals have migrated and continue to migrate in the subsurface, contaminating and imminently threatening to contaminate Plaintiff's wells and water supply (hereafter "Contaminated Sites.")

4. The Defendants in this action are the current and/or former operators and/or owners of the Contaminated Sites which are the source and cause of the contamination and threat of contamination to Plaintiff's wells and Water System.

5. Plaintiff files this lawsuit to recover compensatory and all other damages, including all necessary funds to investigate and monitor any contamination of, or pollution to, Plaintiff's water supply; to reimburse Plaintiff for the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment required to remove p-CBSA and other harmful chemicals from its drinking water supplies and/or of

2

finding an alternative water supply and constructing a new water system; and, thereby
ensuring that the responsible parties bear such expense, rather than Plaintiff and its
ratepayers.

## II. THE PARTIES

6.  Plaintiff is a city in Michigan that is organized as a municipal corporation.  Plaintiff owns
    and operates a public drinking water system which includes, among other elements,
    drinking water production wells which draw from one or more groundwater aquifers,
    associated pumping, storage and distribution facilities and equipment, all of which will be
    referred to collectively in this Complaint as Plaintiff's "Water System."  Plaintiff's Water
    System provides potable water to residents, businesses and government facilities in and
    around St. Louis, Michigan.  Among other things, Plaintiff's Water System includes the
    right of Plaintiff to appropriate and use groundwater for drinking water supplies from its
    wells.  Plaintiff has a significant property interest in the waters it appropriates and uses
    from its wells.  The past, present and continuing contamination of such waters by p-
    CBSA, and the imminent threat of contamination by other harmful chemicals, constitutes
    injury to Plaintiff's Water System for which Plaintiff hereby seeks damages and other
    appropriate relief.

7.  Defendant VELSICOL CHEMICAL CORPORATION ("Velsicol") is a Delaware
    corporation with its principal place of business in Illinois, which at all times relevant to
    this action was doing business in St. Louis, Michigan.  Velsicol, among other things,
    owned and operated a DDT manufacturing plant ("plant site") in St. Louis, Michigan,
    where it, among other things, manufactured, stored, and handled DDT and various DDT-
    related by-products and wastes, including p-CBSA.  At the plant site and other
    Contaminated Sites Velsicol owned, operated, and/or controlled, Velsicol injected,
    buried, discharged, disposed of, failed to contain and/or otherwise released into the

environment p-CBSA and other harmful chemicals that are contaminating and/or threatening to contaminate Plaintiff's wells and Water Supply.

8. Northwest Industries ("NWI") purchased Velsicol in 1965. In 1986, NWI became owner of the plant site. NWI eventually became a subsidiary of Fruit of the Loom, Inc ("FTL"). In December 1999, FTL filed for bankruptcy. Defendant NWI-1, Inc. (NWI/FTL Successor) is the reorganized successor of FTL.

9. Defendant Le Petomane III, Inc. is the trustee of the FTL Custodial Trust, a liquidation trust that was formed pursuant to the FTL plan of reorganization and a bankruptcy settlement agreement with the U.S. Environmental Protection Agency (EPA) and several state environmental agencies. The purpose of the Custodial Trust is to manage seven contaminated properties and address the environmental liabilities related to those sites. The Custodial Trust currently owns one or more of the Contaminated Sites.

10. Defendant Le Petomane II, Inc. is the trustee of the FTL Successor Trust, a liquidation trust formed pursuant to the FTL reorganization plan and settlement agreement. The Successor Trust holds assets on behalf of the Custodial Trust to be used for remediation of those seven contaminated properties, which includes one or more of the Contaminated Sites.

11. Defendant EDGEWOOD FARMS, INC. ("Edgewood Farms") is a Michigan corporation and the current owner/operator of a property opposite the main Velsicol plant site that was utilized as an industrial waste burning and disposal ground, which includes one or more of the Contaminated Sites.

12. The names and capacities, whether individual, corporate or otherwise, of defendants named herein as DOES 1 through 300, inclusive, are unknown at this time to Plaintiff who therefore sues said defendants by such fictitious names. Plaintiff will amend the Complaint to show the true names and capacities of said defendants when their identities and capacities have been ascertained.

4

13. The defendants named in paragraphs 7-11 above and defendant DOES 1 through 300, inclusive, are referred to collectively herein as "Defendants."

14. When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

## III. JURISDICTION AND VENUE

15. This court has subject matter jurisdiction over this action pursuant to MCL § 600.601 and § 600.605 which provide that the Circuit Courts have jurisdiction of all civil actions and proceedings.

16. Venue is proper in this Circuit Court pursuant to MCL § 600.1629 because the injury occurred and continues to occur in Gratiot County and St. Louis is located in Gratiot County.

17. Jurisdiction and venue in this Court are proper pursuant to Chapter 7, Part 201 of the Michigan Natural Resources and Environmental Protection Act (NREPA), MCLA § § 324.20101 et seq. The amount in controversy exceeds $25,000, exclusive of interest and costs.

## IV. ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

### A. The Contamination

18. P-CBSA is a by-product of the manufacture of DDT, which was historically used as a pesticide in agriculture and to control insects that carried diseases. DDT poses such substantial risks to human health and the environment that the federal government banned its use in the U.S. in 1972.

19. Neither p-CBSA nor DDT occurs naturally in the environment. P-CBSA has been found at contaminated sites where DDT manufacturing occurred or where wastes associated

5

with the manufacture of DDT were disposed of through burial, dumping, and/or injection into the subsurface and/or spilled or otherwise released into the environment.

20. Because of its physical characteristics, p-CBSA can have an extensive negative impact on human health and the environment. It is highly soluble in water, and is resistant to degradation and adsorption to soil or sediment particles. Once introduced into the subsurface, p-CBSA migrates rapidly through soil and groundwater. Once introduced into an aquifer, p-CBSA moves freely with the groundwater at approximately the rate of the groundwater's flow. P-CBSA has been detected in the groundwater at former DDT manufacturing and waste sites decades after manufacturing ended.

21. P-CBSA was injected, buried, discharged, disposed of and/or otherwise released into the environment at various times in varying amounts at one or more of the Contaminated Sites, and has migrated from the Contaminated Sites through the subsurface and into the groundwater and now contaminates Plaintiff's wells and water supply.

22. No federal or state agency has approved p-CBSA as an additive to drinking water.

23. The presence of p-CBSA in drinking water presents a significant threat to public health and welfare.

24. P-CBSA is known to travel farther and faster in groundwater than other harmful compounds associated with DDT manufacture. As a result of its mobility and solubility, detection of p-CBSA in groundwater is known and expected to be a potential precursor to detection of other harmful contaminants from the same source that migrate more slowly through the subsurface.

25. The Contaminated Sites are contaminated at the surface, subsurface, and in the groundwater beneath with harmful chemicals, including, but not limited to, p-CBSA, DDT, chlorobenzene, carbon tetrachloride, trichloroethylene (TCE), tetrachloroethene (PCE), polybrominated biphenyl (PBB), lead, polychlorinated biphenyls (PCBs), Tris (2,3-Dibromopropyl) Phosphate (TRIS), and vinyl chloride. These and other harmful chemicals were injected, buried, discharged, disposed of and/or otherwise released into

6

the environment at various times in varying amounts at one or more of the Contaminated Sites, including, but not limited to, the plant site, and are migrating from such sites through the subsurface and now imminently threaten to contaminate Plaintiff's wells and water supply.

**B. History of Contamination in St. Louis**

26. In 1965, Velsicol took ownership of a 52-acre chemical manufacturing facility on the shores of the Pine River in the city of St. Louis, Michigan. The plant had been operating since 1936. Over the years, a host of different hazardous chemical products were manufactured at the site, including magnesium oxide, DDT, fire retardants consisting of tris (2,3-dibormoproyl) phosphate (TRIS) and polybrominated biphenyls (PBB), soil and grain fumigants such as methyl bromide, and hexabromobenzene (HHB). Velsicol operated the plant until 1978.

27. Velsicol employed poor waste management practices at the plant site, including discharging contaminants directly to the adjacent Pine River. As a result, the site soils became contaminated with PBB, HBB, DDT, TRIS, and other contaminants; the groundwater became contaminated with vinyl chloride, toluene, chlorobenzene, DDT and other contaminants; Pine River sediments became contaminated with PBB, HBB, and DDT, and Pine River fish became contaminated with high levels of PBB, DDT, and other contaminants. There is still a "no consumption" advisory for all species of fish in the Pine River. The plant site is a Contaminated Site.

28. From the 1930s through the 1970s, Velsicol and its predecessor in interest also deposited, stored and/or disposed of p-CBSA and other hazardous wastes at a site known as the "burn pit" or the "golf course site," which is located across the Pine River from the main Velsicol plant site. Most of the property constituting the golf course site was subsequently transferred to other owners, including defendant Edgewood Farms. The golf course site is a Contaminated Site.

7

29. Velsicol also dumped, disposed of, injected and/or otherwise released p-CBSA and other hazardous wastes into deep-injection wells in various locations in and around St. Louis. The deep-injection wells are Contaminated Sites.

30. In 1982, as part of a clean-up effort, Velsicol removed contamination located at the golf course site and other Contaminated Sites, deposited these contaminated soils at the main plant site, and attempted to contain the contamination there. Despite these activities, and as a result of Velsicol's wrongful and tortious conduct described herein, the containment system has been and continues to leak various harmful chemicals into both the Pine River and the drinking water aquifer, all to Plaintiff's detriment and injury.

### C. Velsicol's Knowledge of p-CBSA's Hazards

31. Velsicol knew or should have known of the grave harm and threat to public health and welfare and the environment that would occur by intentionally, knowingly, recklessly, wantonly, and/or negligently storing, handling, injecting, burying, failing to contain, discharging, disposing of and/or releasing p-CBSA and other harmful chemicals into the environment. Velsicol knew or should have known its actions were threatening widespread pollution of groundwater, contamination of public and private drinking water supplies, and increased costs to public water suppliers and their customers.

32. Velsicol knew that it was substantially certain that its acts and omissions described above would cause injury and damage, including contamination of water supplies by p-CBSA and other harmful chemicals. Velsicol committed each of the above-described acts and omissions knowingly, willfully, wantonly, and with reckless disregard for Plaintiff's rights, health, and safety and those similarly situated. Plaintiff is entitled to an award of exemplary damages against Velsicol that is sufficient to compensate Plaintiff for the humiliation, outrage, and indignity it has suffered by Velsicol's wanton acts.

**D. The Impact of the Contamination on Plaintiff's Water System**

33. P-CBSA has been detected in varying amounts at varying times in water extracted from Plaintiff's wells. The detection and/or presence of p-CBSA, and the threat of further detection and/or presence of p-CBSA and other harmful chemicals in the wells, have resulted in significant injuries and damages to Plaintiff.

34. The injuries to Plaintiff caused by Defendants' conduct as alleged herein constitute an unreasonable interference with, and damage to, the limited subterranean supplies of fresh drinking water on which Plaintiff's wells depend and in which Plaintiff has a significant property interest. Plaintiff's interest in protecting the quality of its limited drinking water supplies constitutes a reason personal for seeking damages sufficient to restore and/or replace such drinking water supplies to their pre-contamination condition.

35. Defendants, and each of them, are jointly and severally liable for the damages alleged herein.

<u>COUNT I</u>

<u>Michigan Natural Resources Environmental
Protection Act Against Velsicol, NWI-1, the
Successor Trust, and the Custodial Trust</u>

36. Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth in full.

37. Plaintiff is a person as that term is used in the Michigan Natural Resources Environmental Protection Act (NREPA), MCLA § 324.20126a(7).

38. P-CBSA is a hazardous substance as defined under NREPA, MCLA § 324.20101, because it poses an unacceptable risk to the public health, safety and the environment and/or may pose substantial present or potential hazard to human health or the environment.

39. Other compounds present at the Contaminated Sites also are hazardous substances as defined under NREPA, MCLA §324.20126a(7), including but not limited to, p-CBSA,

9

DDT, chlorobenzene, carbon tetrachloride, trichloroethylene (TCE), tetrachloroethene (PCE), polybrominated biphenyl (PBB), lead, polychlorinated biphenyls (PCBs), Tris (2,3-Dibromopropyl) Phosphate (TRIS), and vinyl chloride, because they pose an unacceptable risk to the public health, safety and the environment and/or may pose substantial present or potential hazard to human health or the environment.

40. The Contaminated Sites are facilities under MCLA § 324.20101 because they are areas, places, or properties where hazardous substances, including but not limited to p-CBSA, have been released, deposited, disposed of, or otherwise have come to be located in excess of clean-up criteria concentrations and/or other relevant requirements.

41. Hazardous substances as described herein have been released at various times in various amounts at the Contaminated Sites, are migrating from the Contaminated Sites through the subsurface and now contaminate and/or imminently threaten to contaminate Plaintiff's wells and water supply. As a proximate result of such releases, Plaintiff has incurred, and will continue to incur, necessary response costs.

42. Velsicol is jointly and severally liable for Plaintiff's necessary response costs because Velsicol owned and/or operated one or more of the Contaminated Sites at the time of the disposal of the hazardous substances described herein, including but not limited to p-CBSA, and was responsible for activities causing the release and/or the threat of release of such hazardous substances.

43. NWI-1 is jointly and severally liable for Plaintiff's necessary response costs because NWI-1 owned and/or operated one or more of the Contaminated Sites at the time of the disposal of the hazardous substances described herein and was responsible for activities causing the release and/or the threat of release of such hazardous substances.

44. The Custodial Trust is jointly and severally liable for Plaintiff's necessary response costs because it currently owns and/or operates one or more of the Contaminated Sites.

45. The Successor Trust is jointly and severally liable for Plaintiff's necessary response costs because it is the trust of the Custodial Trust.

46. Defendants are jointly and severally liable to Plaintiff for the response activity costs as defined under MCLA § 324.20126a. As a result of Defendants' actions, Plaintiff has and continues to incur necessary response costs, including, not but limited to, monitoring and investigation costs, studies, treatment and/or replacement of wells, and other remedial actions to remove p-CBSA and other harmful chemicals from its drinking water supplies.

WHEREFORE, Plaintiff prays judgment against these defendants as set forth hereafter.

## COUNT II

### Nuisance Against All Defendants

47. Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth in full.

48. Plaintiff is the owner of land, easements and water rights that permit it to extract groundwater for use in its Water System. Plaintiff's injury is separate and distinct from that of the public.

49. Plumes of contamination that originated at the Contaminated Sites have migrated and continue to migrate through the subsurface, contaminating Plaintiff's wells and water supply with p-CBSA and imminently threatening further contamination with other harmful chemicals. Such contamination and the imminent threat of contamination constitute a nuisance.

50. Velsicol and NWI-1 each owned and/or operated the Contaminated Sites at various relevant times and undertook, directed, caused and/or substantially contributed to the injection, burial, failure to contain, discharge, disposal of and/or release into the environment of the p-CBSA and other harmful chemicals that contaminate and/or threaten Plaintiff's wells and water supply, and thereby caused, created, maintained, assisted and/or participated in the nuisance alleged herein.

11

51. The Custodial Trust and the Successor Trust each currently own and/or operate Contaminated Sites and knew or should have known of the nuisance or the unreasonable risk of nuisance involved and failed to take reasonable steps to abate the condition.

52. Edgewood Farms owned and/or operated Contaminated Sites at various relevant times and knew or should have known of the nuisance or the unreasonable risk of nuisance involved and failed to take reasonable steps to abate the condition.

53. Plaintiff has not consented to, and does not consent to, the contamination alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this nuisance.

54. The nuisance caused, contributed to, maintained, assisted and/or participated in by Defendants, and each of them, has caused substantial injury and significant harm to Plaintiff's wells and water supply, in which Plaintiff has a significant property interest.

55. The nuisance caused, contributed to, maintained, assisted and/or participated in by Defendants, and each of them, has and continues to substantially and unreasonably interfere with, obstruct and/or disturb Plaintiff's right to appropriate, use and enjoy groundwater from its wells.   Plaintiff is specially and adversely affected by the nuisance.

56. As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff's wells and water supply have been, and continue to be, contaminated with p-CBSA and are imminently threatened with contamination by other harmful substances, causing Plaintiff significant injury and damage.  As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the p-CBSA contamination and threat of further contamination of Plaintiff's Water System in an amount to be proved at trial.

57. For all the reasons set forth in Paragraphs 31 and 32, Plaintiff is entitled to an award of exemplary damages against Velsicol.

WHEREFORE, Plaintiff prays judgment against Defendants as set forth hereafter.

## COUNT III

### Trespass Against All Defendants

58. Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth in full.

59. Plaintiff is the owner and actual possessor of its Water System, which includes drinking water production wells that draw groundwater from one or more aquifers.

60. Plaintiff owns, possesses and actively exercises property rights to appropriate and use groundwater drawn from the drinking water production wells described in the preceding paragraph.

61. Defendants Velsicol and NWI-1 negligently, recklessly and/or intentionally failed to properly control, handle, contain and/or dispose of p-CBSA, such that they proximately caused p-CBSA to enter, invade, intrude upon and injure Plaintiff's possession of property without authorization. Velsicol and NWI-1 negligently, recklessly and/or intentionally failed to properly control, handle, contain and/or dispose of numerous other harmful chemicals, such that they created an imminent threat that such chemicals will enter, invade, intrude upon and injure Plaintiff's possession of property without authorization.

62. Defendants knew that it was substantially certain that pollutants originating at the Contaminated Sites would contaminate groundwater and cause damage to public water supplies.

63. The Successor Trust, the Custodial Trust, and Edgewood Farms knew or should have known of the trespass or the unreasonable risk of trespass and ratified the intrusion on Plaintiff's possession of property by failing to remove or taking reasonable steps to remove the continuing trespass.

13

64. Plaintiff has not consented to, and does not consent to, the contamination alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

65. As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff's wells and water supply have been, and continue to be, contaminated with p-CBSA and imminently threatened with contamination by other harmful substances, causing Plaintiff significant injury and damage. As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the p-CBSA contamination and threat of further contamination of Plaintiff's Water System in an amount to be proved at trial.

66. For all the reasons set forth in Paragraphs 31 and 32, Plaintiff is entitled to an award of exemplary damages against the Velsicol.

WHEREFORE, Plaintiff prays judgment against Defendants as set forth hereafter.

## COUNT IV

### Negligence Against All Defendants

67. Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth in full.

68. Defendants had a duty to Plaintiff and breached their duty to use due care in the storing, containment, handling, and disposal of p-CBSA and other harmful chemicals.

69. Velsicol and NWI-1 had a duty to Plaintiff and breached their duty to use due care by injecting, burying, disposing of, failing to contain and/or otherwise releasing p-CBSA and other harmful chemicals in such a manner that these chemicals have migrated from the Contaminated Sites, contaminated groundwater and now contaminate or imminently threaten to contaminate Plaintiff's wells and water supply.

14

70. It was foreseeable that harmful chemicals would migrate from the Contaminated Sites and cause Plaintiff injury.

71. The Successor Trust, the Custodial Trust, and Edgewood Farms knew or should have known of the unreasonably dangerous conditions to persons and property outside the land and failed to take reasonable steps to protect Plaintiffs from it.

72. Plaintiff has not consented to, and does not consent to, the trespass alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

73. As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff's wells and water supply have been, and continue to be, contaminated with p-CBSA and imminently threatened with contamination by other harmful substances, causing Plaintiff significant injury and damage. As a direct and proximate result of Defendants' unreasonable, reckless and/or ultrahazardous conduct as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the p-CBSA contamination and threat of further contamination of Plaintiff's Water System in an amount to be proved at trial.

74. For all the reasons set forth in Paragraphs 31 and 32, Plaintiff is entitled to an award of exemplary damages against Velsicol.

WHEREFORE, Plaintiff prays judgment against Defendants as set forth hereafter.

## COUNT V

### Declaratory Relief Against All Defendants

75. Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth in full.

76. An actual controversy exists concerning who is responsible for liability arising out of actual and/or threatened contamination of groundwater resources within Plaintiff's Water System.

77. In order to resolve this controversy, Plaintiff seeks an adjudication of the respective rights and obligations of the parties, in conjunction with an award of damages, to the extent necessary to provide full relief to the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a trial of this Action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

a.    An award of compensatory damages according to proof;

b.    An award of necessary response costs, including enforcement costs;

c.    Attorneys' fees and costs incurred in prosecuting this action, and prejudgment interest, to the full extent permitted by law;

d.    An award of exemplary damages against Velsicol;

e.    An order declaring that defendants are liable for the full costs of all future

investigation, treatment, remediation and monitoring costs and expenses related to the p-

CBSA contamination and threat of further contamination of Plaintiff's Water System;

f.    Such other further relief as the Court may deem just and proper.


DATED:    July 5, 2007          SHER LEFF LLP

By:

VICTOR M. SHER
TODD E. ROBINS
ANDREA S. ISSOD
SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 348-8300
Facsimile: (415) 348-8333

KEVIN MADONNA
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514

DAVID OTIS
Plunkett & Cooney PC
325 E Grand River Ave Ste 250
East Lansing, MI  48823
Telephone: (517) 324-5612

Attorneys for Plaintiff,
CITY OF SAINT LOUIS

17

## JURY DEMAND

PLAINTIFF CITY OF ST. LOUIS, by and through its attorneys, hereby makes a demand for trial by jury in the above captioned matter.

DATED:    July 2, 2007        SHER LEFF LLP

By:

VICTOR M. SHER
TODD E. ROBINS
ANDREA S. ISSOD
SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 348-8300
Facsimile: (415) 348-8333

KEVIN MADONNA
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514

DAVID OTIS
Plunkett & Cooney PC
325 E Grand River Ave Ste 250
East Lansing, MI 48823
Telephone: (517) 324-5612

Attorneys for Plaintiff,
CITY OF SAINT LOUIS

08CV2822          TD
JUDGE SHADUR
MAGISTRATE JUDGE VALDEZ

# EXHIBIT 3



**AIG Domestic Claims, Inc.**
**P & C Severity Claims**
**Pollution Insurance Products (PIP)**
**High Profile Claims Department**
101 Hudson Street, 31ˢᵗ Floor
Jersey City, New Jersey 07302
Phone: 201-631-7427
Fax: 201-328-3260
e-mail: Edward.devivo@aig.com

February 5, 2008

Mr. George R. Harvell III
Manager, Environmental Services
Memphis Environmental Center, Inc.
5909 Shelby Oaks Drive
Suite 146
Memphis, Tennessee 38134

|  |  |  |
|---|---|---|
| Re: | Insured: | **Velsicol Chemical Corporation** |
|  | Location: | **St. Louis, Michigan** |
|  | Policy: | **PLS/CCC 4761684** |
|  | Coverages Purchased: | **A, B, C, D, E, F, G, H, I, J, K, L** |
|  | AIGDC Claim No: | **182-090728** |

Dear Mr. Harvell:

I write on behalf of AIG Domestic Claims, Inc. ("AIGDC"), as successor-in-interest to AIG Technical Services, Inc. AIGDC is an authorized representative of American International Specialty Lines Insurance Company ("AISLIC").

I am in receipt or your letters to Steve Lessick dated May 21, 2007 and July 30, 2007, tendering the action captioned *City of St. Louis* v. *Velsicol Chemical Corporation, et al.*, No. 07-Civ-13683 (the "Lawsuit") to AISLIC. Your letters appear to claim coverage for the Lawsuit under a policy issued to Velsicol Chemical Corporation (PLS/CCC 4761684) (the "Velsicol Policy"), as well as under a policy issued to Fruit of the Loom, PLL 2675370 (the "FTL Policy"). After reviewing the Complaint, First Amended Complaint, and other pleadings filed in the Lawsuit, as well the Velsicol Policy, AISLIC has determined that it will accept coverage of the Lawsuit under the Velsicol Policy, subject to all the terms and conditions of the Velsicol Policy, including all relevant deductibles, which have not yet been satisfied. Coverage is not accepted under the FTL Policy, as Velsicol is not insured by that policy.

We understand that Velsicol has retained Winston & Strawn to represent Velsicol in the Lawsuit. Section I.2 of the Velsicol Policy imposes certain requirements on Velsicol in retaining counsel — e.g., counsel must have experience in defending Claims similar to those pending against the Insured and must have errors and omissions insurance coverage. Please confirm that these requirements have been satisfied as to Winston & Strawn. Moreover, we note that, under Section I.2 of the Velsicol Policy, AISLIC is responsible to pay only those attorneys' fees and other litigation expenses that AISLIC would ordinarily pay to counsel in the defense of similar claims in the community where the Claim is being defended. We enclose a copy of our litigation guidelines for counsel and ask that you forward them to Winston & Strawn. The

February 5, 2008
Page 2

guidelines require counsel defending an insured to create and adhere to an Agreed-To Litigation Plan. Please provide us with contact information for the lawyer at Winston & Strawn in charge of the matter for Velsicol so that we may arrange for receipt of the ATLP and discuss the handling of the matter going forward.

AISLIC advises you that counsel for the City of St. Louis and counsel for other named defendants have reached out to AISLIC and initiated discussions aimed at resolving the Lawsuit at an early stage. AISLIC intends to respond to those overtures on Velsicol's behalf and will keep Velsicol advised as to the status and content of any such discussions. I enclose a proposal received from the trustee of the trusts created in the FTL bankruptcy proceedings, and I invite your comments on the proposal.

Please be advised that this letter refers only to AISLIC Policy PLS/CCC 4761684 and, except for the disclaimer of coverage under the FTL Policy, does not in any way address any other policy issued by AISLIC or by any other insurance company. AISLIC's acceptance of coverage is limited to the Lawsuit and, as set forth above, is subject to all the terms and conditions of the Velsicol Policy. AISLIC does not waive or surrender any of its rights under that Policy or under any of the terms, conditions, limitations, and/or exclusions contained therein.

Sincerely,

Edward De Vivo/ams

Edward DeVivo